# EXHIBIT "A"

**AMERICAN GENERAL FINANCIAL SERVICES**

## AMERICAN GENERAL HOME EQUITY LINE OF CREDIT AGREEMENT

| | | |
|---|---|---|
| ACCOUNT NUMBER [redacted] | | |
| DATE 05/27/05 | CREDIT LIMIT $ 92000.00 | TYPE OF LOAN (Alpha) Y00 |
| LENDER/SECURED PARTY NAME AND ADDRESS ("Lender") | LENDER'S TELEPHONE NUMBE[redacted] | |
| AMERICAN GENERAL CONSUMER DISCOUNT COMPANY<br>412 W RIDGE PIKE<br>CONSHOHOCKEN, PA 19428-0167 | | |
| BORROWER(S) NAME AND ADDRESS ("I","We") | | |
| JACKIE M HILL<br>LARRY D HILL<br>314 E. BASIN STREET<br>NORRISTOWN, PA 19401 | | |

| PROPERTY THAT SECURES THIS LINE OF CREDIT | | |
|---|---|---|
| [X] Conventional Home and Real Estate | [ ] Manufactured Home and Real Estate | [ ] Other Real Estate |
| PROPERTY ADDRESS<br>314 E. BASIN STREET<br>NORRISTOWN, PA 19401 | PROPERTY ADDRESS | PROPERTY ADDRESS |

1. **Meaning of Some Words.** In this Agreement, the words "Borrower," "I," "me," "my," "we," and "our" mean all persons signing this Agreement as a "Borrower" or "Co-Borrower." The words "Lender," "you," and "your" mean AMERICAN GENERAL CONSUMER DISCOUNT COMPANY its successors, and assigns.
2. **Home Equity Line of Credit Agreement.** Lender has opened a Line of Credit for me (my "Account"). This American General Home Equity Line of Credit Agreement ("Agreement") states the terms and conditions of my Account. I have read this Agreement carefully and will keep a copy for my records.
3. **Credit Limit.** The maximum amount of credit available to me under this Agreement is called my Credit Limit. My Credit Limit is stated above. The total amount I owe Lender at any time under this Agreement and my Security Instrument (defined in Section 5 below) is called my Total Balance. The total amount available for me to borrow from my Account at any time is called my Available Credit. My Available Credit equals my Credit Limit, less my outstanding Principal Balance. My Principal Balance is the amount I owe Lender for each Draw (defined in Section 7 below) on my Account, as well as any fees and charges that are added to my Principal Balance and any credit insurance premiums.
4. **Promise to Pay.** I promise to pay to the order of Lender my Total Balance. If more than one Borrower signs this Agreement, all of us are bound by this Agreement, and each of us, together and individually, will keep all of the promises we make in this Agreement, including our Promise to Pay. If someone other than a Borrower uses my Account, I promise to pay amounts owed to Lender because of Draws by that person, even if that person did not have my permission and even if I told Lender that the person was using my Account, to the extent permitted by applicable law.
5. **Security Interest.** At the time I sign this Agreement, I also will give Lender a mortgage, deed of trust, and/or other security instrument (the "Security Instrument"). The Security Instrument gives Lender a security interest in the property (the "Security Interest") described at the beginning of this Agreement (the "Property"). Lender's Security Interest will be limited to my Credit Limit plus any unpaid finance charges. The Property will be used as the principal residence of at least one Borrower, unless Lender otherwise agrees. I agree not to allow any other lien to be filed against the Property that will be superior to or adversely affect Lender's Security Interest.
The Security Instrument will not secure other debts I owe Lender, unless it specifically states that it secures those debts. This Agreement and my Account will not be secured by a mortgage, deed of trust, or other security instrument on anyone's principal residence, unless the mortgage, deed of trust, or other security agreement specifically states that it secures this Agreement.
6. **Using My Account.**

   **Right to Cancel.** If the Property is the principal residence of any Borrower, I may be entitled to cancel all or a part of this Agreement under the Truth in Lending Act and Regulation Z or other applicable law. If Lender gives me a Right to Cancel, I may not use my Account until the Right to Cancel expires. I may also be entitled to rescind a Security Interest added or increased in the event that the Credit Limit on my Account is increased.

   **The Term of This Agreement.** The term of this Agreement is divided into two periods: the 10 year "Draw Period" and the "Repayment Period." The Repayment Period will vary depending on the payment option I choose.

   **Draw Period.** An advance of funds from my Account is called a Draw. This Agreement and the Draw Period begin on 05/27/05. The Draw Period will continue for 10 years and will end on 05/26/15 (the "Last Draw Date").

   **Repayment Period.** After the Draw Period ends, the Repayment Period begins ("Repayment Period"). During the Repayment Period, I may not take any Draws, and I must repay the Total Balance in accordance with the payment option I choose.

   **Credit Limit.** I may make Draws on my Account up to my Credit Limit; however, I may not take a Draw greater than my Available Credit. If I do request a Draw greater than my Available Credit in violation of this Agreement, Lender may but is not obligated to honor that Draw request, and Lender is not obligated to honor future Draw requests in excess of my Credit Limit.
7. **Draws.** There are two kinds of Draws: the "First Draw" and "Subsequent Draws."

   **First Draw.** I must take a First Draw in the minimum amount of $ 1000.00 on 06/02/05 (the "First Draw Date"). My First Draw will be paid to me by check. In addition to my First Draw, any Fees due under this Agreement that I choose to finance will be added to my Principal Balance.

**SEE ADDITIONAL PAGES FOR IMPORTANT INFORMATION**

**AMERICAN GENERAL HOME EQUITY LINE OF CREDIT AGREEMENT (con'**[redacted]

**Subsequent Draws.** I may take Subsequent Draws during the Draw Period by writing special ch[redacted] (each, a "Check"), but I may not request a Subsequent Draw for an amount greater than my Available Credit. Each Subsequent Draw must be for at least $ 100.00 . Immediately after any Subsequent Draw, my Principal Balance must exceed $ N/A . I may obtain Subsequent Draws at Lender's offices or by using my Checks I receive from Lender. Lender may charge amounts to my Account as Subsequent Draws to protect Lender's Security Interest in the Property, as stated in the Security Instrument, at any time.

**Checks.** I can use my Checks, subject to the terms of this Agreement. When Lender honors a Check, Lender may charge the amount of the Check to my Account, even if it is post-dated, stale, or will cause me to exceed my Credit Limit. Lender is not obligated to pay Checks that will cause me to exceed my Credit Limit, but, if Lender does so, Lender is not obligated to do so again in the future. Checks will not be returned with my Monthly Statements. Lender can pay Checks in any order it chooses even though this may affect whether I exceed my Credit Limit, unless otherwise required by law.

**Stop Payment Requests.** If I ask, Lender may attempt to stop payment on a Check, but Lender will have no liability to me if Lender does not. An oral request to stop payment is good for only fourteen (14) calendar days unless I confirm it in writing within that period. A written request is good for only six (6) months unless I renew it in writing within that period. I will contact Lender immediately if I wish to stop payment on a Check. Lender then will send me a "Stop Payment Request" form that I must sign and return to Lender. Lender will advise me of other rules that will apply to Stop Payment Requests.

**Loss of Checks.** I must notify Lender immediately if any of my Checks are lost or stolen or if I learn that any of the Checks have been used without my permission. To report the loss or theft of my Checks, I may write to Lender at the address listed at the beginning of this Agreement or on my Monthly Statement ("Lender's Address") or call Lender at the telephone number listed at the beginning of this Agreement or on my Monthly Statement ("Lender's Telephone Number"). Lender may change Lender's Address or Lender's Telephone Number by telling me in my Monthly Statement. If my Account is closed for any reason, I agree to return all unused Checks to Lender immediately.

**Restrictions on Draws.** Lender may refuse to honor any Draw request:

(a) that will cause me to exceed my Credit Limit;
(b) that I try to use to make any payments on my Account or any other account due to Lender, unless I first get Lender's permission in writing;
(c) that does not comply with this Agreement;
(d) if Lender has suspended or terminated my Account; or
(e) if I am otherwise in default of this Agreement.

Lender is not responsible if I am dissatisfied with the goods or services I have purchased or leased with Draws from my Account or if anyone does not accept my Check.

**8. How My Finance Charges Are Computed.** Finance charges will be assessed on my Account in the form of Additional Fees described in Section 10 below and by applying the applicable daily periodic rate disclosed in Section 9 below to the average daily balance on my Account and then multiplying the resulting product by the number of days in the billing cycle. The Finance Charge calculated in this manner will never exceed the Finance Charge that would result from applying the daily periodic rate to the daily balance for each day of the billing cycle. Finance charges will be disclosed on my Monthly Statement as the Finance Charge. The daily periodic rate applied to my Account will be determined by dividing the annual percentage rate applicable to my Account (the "Annual Percentage Rate") for the billing cycle by 365 (the "Daily Periodic Rate").

**Calculation of Average Daily Balance.** Lender figures a portion of the Finance Charge on my Account by applying the Daily Periodic Rate to the average daily balance on my Account. To get the average daily balance, Lender takes the beginning Principal Balance (which excludes any accrued and unpaid finance charges resulting from the daily periodic rate) on my Account each day, adds any new Draws, Fees (as defined below), and credit insurance premiums (except as otherwise provided in this Agreement), and subtracts any payments or credits. This gives Lender the "Closing Daily Balance" on my Account. Then, Lender adds all the Closing Daily Balances for the billing cycle and divides the total by the number of days in the billing cycle. This gives Lender the "Average Daily Balance." The Closing Daily Balance will reflect payments, credits, draws, and debits posted to my Account each day but will not include any unpaid finance charges resulting from the daily periodic rate.

**No Grace Period.** There is no grace period during which I can make a payment and avoid a Finance Charge. Finance charges will begin to accrue on the day that Draws, Fees (as defined below), or credit insurance premiums are posted to my Account.

**9. Annual Percentage Rates/Daily Periodic Rates.** The interest rate that Lender uses to calculate a portion of the Finance Charge on my Account is called an Annual Percentage Rate or a Daily Periodic Rate. The Annual Percentage Rate is the Daily Periodic Rate of interest on my Account expressed as an annual rate.

☐ **Fixed Annual Percentage Rate/Daily Periodic Rate.** The **ANNUAL PERCENTAGE RATE** applied to my Account is N/A %. The Daily Periodic Rate applied to my Account is N/A %.

☒ **Variable Annual Percentage Rate/Daily Periodic Rate.** My Annual Percentage Rate and Daily Periodic Rate may change quarterly . The Annual Percentage Rate and the Daily Periodic Rate on my Account are based on an index. The index is the highest Prime Rate in the "Money Rates" listing in The Wall Street Journal on the first business day after the 14th day of the month preceding each quarterly anniversary of my Account. The anniversary of my Account is three (3) months from the Date of Agreement above and the same date of each quarterly time period thereafter (my "Anniversary"). To get my Annual Percentage Rate, Lender adds 3.210 percentage point(s) (the "Margin") to the index. My initial **ANNUAL PERCENTAGE RATE** is 8.960%, and my initial Daily Periodic Rate is .0245%. If the index becomes unavailable during the term of this Agreement, Lender may use a comparable index after Lender notifies me.

**Rate Changes.** The Annual Percentage Rate can change quarterly , but the rate cannot increase or decrease by more than 1.000 percentage point(s) at any rate change. Changes in the Annual Percentage Rate and Daily Periodic Rate for my Account will take effect on the first day of the billing cycle beginning on or after the Anniversary of my Account. My Monthly Statement will show the Annual Percentage Rate and Daily Periodic Rate that applied to my Account during the billing cycle. Increases in the Annual Percentage Rate and Daily Periodic Rate for my Account may result in a greater Finance Charge and an increase in the Current Payment I must make on my Account. The **ANNUAL PERCENTAGE RATE** on my Account will never be more than 15.000%, which is the same as a Daily Periodic Rate of .0411%, or be less than 5.000%, which is the same as a Daily Periodic Rate of .0137%.

**SEE ADDITIONAL PAGES FOR IMPORTANT INFORMATION**

**AMERICAN GENERAL HOME EQUITY LINE OF CREDIT AGREEMENT (con't)** [redacted]

☐ **Introductory Discount for Annual Percentage Rate/Daily Periodic Rate.** Initially, during the discount period, the Annual Percentage Rate and Daily Periodic Rate applicable to my Account will not be the Annual Percentage Rate and Daily Periodic Rate shown above. The Introductory ANNUAL PERCENTAGE RATE is N/A %, and the Introductory Daily Periodic Rate is N/A %. The Introductory Annual Percentage Rate and Daily Periodic Rate applicable to my Account will be in effect from the First Draw Date through the first NA billing cycles. Thereafter, beginning on the first day of the next billing cycle, the Annual Percentage Rate and Daily Periodic Rates shown above will apply.

**Each Annual Percentage Rate disclosed above includes only interest and not other charges.**

**10. Fees.** I agree to pay certain fees and charges ("Fees") as provided below. I agree that Lender may charge these Fees to my Account and include these Fees in my Principal Balance, except as otherwise provided in this Agreement. Fees will not be refunded if my Account is closed for any reason, unless required by law.

**Loan Fees.** I agree to pay the following Loan Fees in connection with my Account. If I do not pay the Loan Fees in cash when I open my Account, funds may be advanced from my Account to pay these Loan Fees at the time I take my First Draw.

**Loan Fees Paid to Lender.**
$ 150.00 Document Preparation Fee

**Loan Fees Paid to Third Parties.**
$ 810.75 Title Insurance Fee
$ 265.00 Appraisal Fee
$ 50.50 Recording/Releasing Fees RE

**Additional Fees.** I also agree to pay the following Additional Fees on my Account. These Fees are an additional kind of FINANCE CHARGE. These Additional Fees will appear on my first Monthly Statement in the "FINANCE CHARGE" box.

**Additional Fees Paid to Lender.**
$ 2760.00 Points

**Additional Fees Paid to Third Parties.**
$ 270.00 Attorney Fee
$ 59.00 Tax Service Fee

**Account Fees.** If checked, Lender may charge the following Fees to my Account:

☐ **Initial Annual Fee.** Lender may charge an Annual Fee on my Account on my first Monthly Statement. The initial Annual Fee is $ N/A .

☒ **Subsequent Annual Fee.** Lender may charge a subsequent Annual Fee on my Account on each annual anniversary during my Draw Period. The subsequent Annual Fee is $ 50.00.

☒ **Late Fee.** I may have to pay a Late Fee as more fully described in Section 34.

☒ **Returned Check Fee.** I may be required to pay a Returned Check Fee as more fully described in Section 35.

☐ **Reconveyance Fee.** I may be required to pay a Reconveyance Fee as more fully described In Section 36.

**11. Payment Options.** Each month I must pay at least the Minimum Payment shown on each of my Monthly Statements by the payment due date. I may make larger payments on my Account at any time and in any amount, but I still must make any Minimum Payment due for the month(s) following that larger payment. The larger my payments, the smaller the total Finance Charge I will have to pay over the term of this Agreement. I may pay the Total Balance on my Account in full at any time; however, I may be required to pay a Prepayment/Termination Fee, as provided In Section 33.

☐ **Percent of New Balance Option.** Under this option and subject to any balloon payment below, my Minimum Payments will be due monthly and will include any Past Due Amounts and any Late Fee and any Returned Check Fees assessed for the billing cycle, plus a Current Payment equal to N/A % of the sum of the Principal Balance, the finance charges, and any credit insurance premiums assessed for the current billing cycle.

☒ **Assumed Term Option.** Under this option and subject to any balloon payment below, my Minimum Payment will be due monthly and will include a Current Payment equal to an amount that would amortize the Principal Balance and the Finance Charge to be earned on my Principal Balance over an assumed term of 30 years (the "Assumed Term") in substantially equal amounts each billing cycle, plus any Past Due Amounts and any credit insurance premiums, any Late Fee, and any Returned Check Fees assessed for the billing cycle. During my Draw Period, if my Principal Balance changes because I take a Draw and/or Fees are charged to my Account or if my Annual Percentage Rate changes (other than an adjustment resulting from the expiration of an Introductory Rate), my Current Payment will be adjusted at the end of the billing cycle in which the change occurs to an amount that would amortize my Principal Balance and the Finance Charge to be earned on my Principal Balance in substantially equal amounts each billing cycle over my Assumed Term; however, the due date of any balloon payment below will remain the same. During the Repayment Period, each time my Annual Percentage Rate is adjusted or an advance is made from my Account pursuant to this Agreement, my Current Payment will also be adjusted to an amount that would amortize my Principal Balance and the Finance Charge to be earned over the remainder of my Assumed Term; however, the due date of any balloon payment below will remain the same.

If the Current Payment determined under either payment option above is less than $ 50.00 , my Current Payment will equal $ 50.00 or the New Balance shown on my Monthly Statement, whichever is less.

☐ **Balloon Payment.** If I only make the required Current Payments on my Account, they will not be sufficient to repay my Total Balance. I will then be required to pay my remaining Total Balance in a single "Balloon Payment" on N/A .
MONTH/DAY/YEAR

**SEE ADDITIONAL PAGES FOR IMPORTANT INFORMATION**

**Allocation of Payments.** Account payments will be applied first to any Late Fee, then to any Returned [redacted] life insurance premiums billed (where applicable), any credit involuntary unemployment insurance premiums billed (where applicable), then to finance charges assessed on my Account, and finally to the Principal Balance of my Account, unless otherwise required by law. Credit Insurance premiums are billed as of the Billing Cycle Closing Date as defined in Section 12 below.

**Form of Payments.** I must make my payments by check, money order, or similar instrument payable in U.S. funds and drawn on a financial institution located in the U.S. I may not mail Lender cash or use a Check (see Section 7 above) to pay Lender; however, I may make my payments in cash in person at any of Lender's offices. I agree not to send Lender payments marked "paid in full," "without recourse," or similar language unless those payments are marked for special handling and sent to Lender's office servicing my Account.

**Where to Send My Payments.** I must send my payment to Lender's Address listed on my Monthly Statement. Payments that Lender receives at Lender's Address by 3 PM each business day will be credited to my Account as of the date of receipt. Payments that Lender receives at Lender's Address after this time will be treated as received by Lender on the next business day. Payments received at any other location will be credited no later than five (5) days after Lender receives them to be credited. I will be sure to include my payment coupon with my payment. If I fail to include my payment coupon, my payment may not be credited to my Account for up to five (5) days. Delayed crediting may cause me to incur a Late Fee and/or additional finance charges.

**First Payment Due Date.** If your account has a balance as of the closing date, your first payment due date will be 07/21/05 .
MONTH/DAY/YEAR

**12. Monthly Statements.** Lender will bill me for payments due on my Account, every month, by sending me a billing statement, called a Monthly Statement. The period of time covered by each Monthly Statement is called a "Billing Cycle." My first Billing Cycle begins on the Date of Agreement. The last day of each Billing Cycle is called the "Billing Cycle Closing Date." Each Monthly Statement will show the activity on my Account during the Billing Cycle. The day of the month when each payment will be due is shown after the words "Payment must be received on or before" (the "Payment Due Date"). Each Monthly Statement will show the Billing Cycle Closing Date, the Payment Due Date for the Billing Cycle, and certain other required information. Lender will send each Monthly Statement to the Borrower's address listed at the top of page 1 of this Agreement, called "Borrower's Address."

**When Lender Will Send My Monthly Statements.** Lender will send me a Monthly Statement for each Billing Cycle in which: (1) Lender charges a Finance Charge; (2) Lender charges a Fee; (3) there is any other activity on my Account; or (4) the law requires that Lender send me a Monthly Statement.

**Billing Errors.** I should review each Monthly Statement carefully and advise Lender in writing of any errors within sixty (60) days of the Billing Cycle Closing Date, as more fully explained on the Billing Rights Statement that accompanies this Agreement.

**13. When Lender May Prohibit Subsequent Draws or Reduce My Credit Limit.** To the extent permitted by applicable law and as provided in the Agreement, Lender may prohibit Subsequent Draws or reduce my Credit Limit if:

(a) The value of the Property decreases significantly below the appraised value of the Property. The appraised value of the Property is the value shown by Lender's most recent appraisal of the Property (the "Appraised Value"); or

(b) Lender reasonably believes that I will be unable to make my Minimum Payments on time because of a material adverse change in my financial circumstances; or

(c) I am in default of a material obligation under this Agreement. A material obligation includes, but is not limited to, my promise: (i) to notify Lender immediately should there be an adverse change in my credit or financial condition; (ii) to give Lender updated financial or credit information upon request; (iii) not to permit any lien to be filed against the Property that will be superior to Lender's Security Interest; and (iv) not to exceed my Credit Limit; or

(d) Government action: (i) prevents Lender from charging any Annual Percentage Rate provided under this Agreement; or (ii) adversely affects the priority of Lender's Security Interest in the Property to the extent that the value of Lender's Security Interest is less than 120% of my Credit Limit; or

(e) When the maximum Annual Percentage Rate under this Agreement is reached; or

(f) Lenders' regulators consider Subsequent Draws to be an unsafe and unsound lending practice; or

(g) I ask Lender to reduce or limit my Subsequent Draws; or

(h) Any event listed in Section 15 below occurs.

**How to Reinstate My Account.** Lender will reinstate my Account during the Draw Period if: (1) I ask Lender in writing to reinstate; (2) I pay any credit report fees and any appraisal fee Lender incurs to update Lender's credit information about me; (3) Lender agrees that the reason that caused Lender to prohibit Subsequent Draws or reduce the Credit Limit no longer exists; and (4) there is no other reason for Lender to prohibit Subsequent Draws or reduce my Credit Limit. Lender may require that all Borrowers sign any request to reinstate.

**14. Required Property Insurance.** I am required to maintain hazard insurance on the Property in types and amounts acceptable to Lender ("Required Insurance"). I have the option of providing the Required Insurance through an existing policy of insurance owned or controlled by me, or through a policy to be obtained and paid for by me. I may purchase this Required Insurance through any insurer, insurance agent, or broker of my choice that is acceptable to Lender. Lender may for reasonable cause decline any insurance provided by me. Required Insurance is not available for purchase through Lender. Required Insurance must: (a) insure the Property against all risks of physical damage, including loss by fire and other hazards for the term of the Agreement; (b) have terms and amounts satisfactory to Lender; (c) name Lender as loss payee or mortgagee; (d) not permit the addition of any other loss payee or mortgagee to the insurance policy unless Lender consents in writing; (e) provide that such insurance will not be canceled or modified without at least fifteen (15) days prior written notice to the loss payee or mortgagee; and (f) not include any disclaimer of the insurer's liability for failure to give such notice. I agree to provide Lender with satisfactory proof of my Required Insurance.

I agree to keep my Required Insurance in force until all amounts that I owe Lender under this Agreement and the Security Instrument are paid in full, my Account is terminated, and Lender releases or discharges the Security Instrument. In case of damage to or loss of the Property, I agree to give prompt notice to Lender and the insurance carrier. If I fail to promptly notify or make proof of loss to the insurance carrier, Lender may (but is not required to) do so on my behalf. I agree that Lender may use any insurance proceeds to reduce the amounts that I owe under this Agreement and the Security Instrument. I authorize Lender to adjust my losses and sign my name to any check, draft, or other papers necessary to obtain such insurance payments. If insurance proceeds paid to Lender do not satisfy all amounts that I owe Lender under this Agreement and the Security Instrument, I remain responsible for payment of the balance of any amounts due under this Agreement and the Security Instrument.

**SEE ADDITIONAL PAGES FOR IMPORTANT INFORMATION**

If, at any time, I fail to buy or keep in force my Required Insurance, Lender may (but is not required to) purchase insurance at my expense to protect Lender's interest in the Property. I agree that Lender may, at its sole option, cancel this insurance and that Lender has a security interest in any unearned premiums from such insurance and I hereby assign to Lender any rights I may have to said unearned premiums and I authorize and appoint Lender as my attorney-in-fact to cancel the insurance and apply the unearned premiums to reduce my Account upon cancellation of said insurance. I agree that this insurance may, but need not, protect my interests. The coverage purchased by Lender may not pay any claim I make. I agree that the cost of insurance purchased by Lender may be much more than the cost of insurance I could have obtained on my own, and I agree that the cost of such insurance may, to the extent permitted by law, be added to my Principal Balance and accrue finance charges. I authorize Lender to purchase the insurance required by this Agreement. I understand that Lender or its affiliate may earn a profit from the purchase of this insurance, to the extent permitted by applicable law.

**15. Default.** To the extent permitted by applicable law, I will be in default of this Agreement if

(a) I file for, or my creditors place me in, bankruptcy and I fail to meet the repayment terms of this Agreement; or

(b) I do not make any Minimum Payment by the Payment Due Date or otherwise fail to meet the repayment terms provided for in this Agreement; or

(c) I commit fraud or materially misrepresent any information with regard to my Account, including, but not limited to, material misrepresentations in my credit application, financial statements that I make to Lender, or any correspondence or discussions that I have with Lender about my Account; or

(d) Any action or inaction by me adversely affects Lender's Security Interest in the Property, for example, (i) I transfer title to the Property or sell the Property without Lender's prior written permission; (ii) I do not maintain Required Insurance on the Property; (iii) I do not pay, when due, taxes that would become a lien on the Property; (iv) I am the only Borrower and I die; (v) I do not maintain the Property, I abandon the Property or I commit waste or otherwise destructively use the Property; (vi) a lien that is superior to Lender's Security Interest is filed against the Property, or a lien that is subordinate to Lender's lien is filed against the Property and that lien adversely effects the Property or Lender's rights in the Property; (vii) the Property is taken by condemnation or eminent domain; (viii) the Property is foreclosed upon by another lien holder; (ix) another creditor attempts to enforce a judgment against the Property; (x) I use the Property illegally such that the Property could be seized; or (xi) I move out of the Property; or

(e) One of two Borrowers dies and Lender's Security Interest is adversely affected thereby.

(**For Kansas residents only**, Lender believes the preceding events would significantly impair the prospect of payment, performance, or realization of collateral. Except for a default resulting from my failure to make any payment as required by this Agreement, the burden of establishing the prospect of such significant impairment is on the Lender.)

If I default, Lender may, subject to providing required notices and right to cure, (i) prohibit Subsequent Draws and (ii) reduce my Credit Limit and (iii) close my Account and require me to pay Lender the Total Balance right away and (iv) foreclose on my Property. If I default and Lender hires an attorney who is not Lender's employee to collect my Account, I will pay Lender's collection costs, including court costs and foreclosure costs and reasonable attorney's fees, to the extent permitted by applicable law.

All of Lender's rights and remedies shall be cumulative and nonexclusive with respect to each and every Borrower or Co-Borrower obligated under this Agreement.

**16. When Lender May Close My Account.** If I am in default, Lender may close my Account and require me to pay the Total Balance immediately, after providing me any notice of default and opportunity to cure required by applicable law. If I am in default, Lender first may choose to take other action, such as prohibiting Subsequent Draws or reducing my Credit Limit; however, unless Lender reinstates my Account, Lender does not give up Lender's right to close my Account and require me to pay Lender the Total Balance immediately, even if I do not default again. If Lender closes my Account and requires me to pay Lender the Total Balance right away, I must pay the Total Balance I owe Lender immediately. Until I pay Lender in full, the Principal Balance will continue to accrue finance charges at the rate disclosed in this Agreement, or the maximum rate allowed by applicable law, whichever is less.

**17. Closing My Account.** Except as otherwise provided in this Agreement, I may close my Account at any time by calling Lender at Lender's Telephone Number and sending a written request to Lender's Address. Lender will close my Account when Lender receives my notice. If more than one person signs this Agreement as a Borrower, any Borrowers request to close the Account will be treated as a request to close this Account by all Borrowers. Lender may not honor any Check Lender receives after Lender receives my notice. If I close my Account, I must stop using it immediately and pay the Total Balance I owe Lender. Until I pay Lender in full, Lender will charge finance charges on the Principal Balance of my Account.

**18. Credit Information.** I must notify Lender immediately if there is any adverse change in my credit or financial condition. I will provide Lender with updated financial or credit information when Lender requests it. Lender may get consumer reports from consumer reporting agencies when Lender reviews my Account.

**19. Notices.** Lender will send me any notice required by this Agreement or by law to Borrower's Address. I will tell Lender in writing if Borrower's Address changes. If Lender mails me a letter, notice, or statement to Borrower's Address, Lender can assume that I have received it. If I send Lender a notice or letter, I must send it to Lender's Address or any other address Lender specifies in my Monthly Statement.

**20. Tax Deductions.** Lender has made no promises to me nor advised me in any way whether the Finance Charges and Fees are "interest" that I may deduct on my tax returns. I should consult a tax advisor about deducting Finance Charges and Fees on my tax returns.

**21. No Transfer.** I will not transfer or assign any of my rights under this Agreement. Lender may transfer or assign any or all of Lender's rights under this Agreement.

**22. Telephone Calls.** Lender may listen to or record Lender's telephone calls with me for quality control purposes. Lender may use and I consent to the use of automated telephone equipment or prerecorded telephone calls to contact me about my Account, to the extent allowed by law. If I have a telephone answering device, Lender may leave messages about my Account or about additional opportunities and promotions on this device.

**23. No Waiver.** Lender may choose to delay enforcing any of Lender's rights or waive any of Lender's rights under this Agreement. Lender may delay enforcing or waiving any of Lender's rights without affecting Lender's other rights. If Lender waives a right, Lender can still enforce the same right later.

**SEE ADDITIONAL PAGES FOR IMPORTANT INFORMATION**

**24. Lender's Errors.** Lender does not intend to charge or collect any interest, charge, or fee that is more than the law allows. If Lender charges or collects any amount over what the law allows, Lender will apply the excess amount first to the Principal Balance due on my Account as a partial prepayment without any Prepayment/Termination Fee. If I have paid my Account in full, Lender will refund any excess amount. If any part of this Agreement is finally determined to be unenforceable under any law, rule, or regulation, all other parts of this Agreement still are valid and enforceable.

**25. How Lender May Change This Agreement.** Subject to any state law requirements, Lender may change the terms of this Agreement if (a) I have already agreed to the change in this Agreement, (b) if I agree to the change in writing at the time Lender requests it, (c) if the change unequivocally will benefit me during the remaining term of this Agreement, or (d) if the change is insignificant (such as changes relating to Lender's data processing systems).

**26. Entire Agreement.** This Agreement, together with all documents executed at the same time, contain the entire agreement of the parties concerning the subject matter hereof, and no party hereto has relied upon any representations except such as are specifically set forth herein.

**27. Broker Representations.** Borrower acknowledges that any broker involved in the transaction is not Lender's agent, and Lender is not bound by any of the brokers representations.

**28. Release of Security.** Lender is not obligated to release the Security Instrument on the Property unless there are no longer any amounts owing to Lender under this Agreement and unless I indicate to Lender in writing that I want to terminate my Account.

**29. Not applicable.**

**30. Not applicable**

**31. Miscellaneous.** I waive the defenses of presentment, notice of dishonor, and protest, if any, to the enforcement of this Agreement and any Security Instrument. Time is of the essence of this Agreement. If any provision of this Agreement shall be adjudged or deemed invalid, illegal, or unenforceable, such provision shall be deemed stricken from this Agreement and the remainder of the Agreement shall be construed as if such provision had never been included. Plural words shall be construed in the singular and singular words in the plural as their context may require, or as required to give effect to the terms of the Agreement. I agree to cooperate in executing any extension or statement of maturity of the Security Instrument securing this Agreement.

**32. Arbitration Agreement and Waiver of Jury Trial. (See following pages).**

**SEE ADDITIONAL PAGES FOR IMPORTANT INFORMATION**

The following notice applies if the proceeds of this loan will be applied in whole or substantial part to a purchase of goods from a seller who either refers consumers to the lender or who is affiliated with the lender by common control, contract, or business arrangement:

**NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.**

## ARBITRATION AGREEMENT AND WAIVER OF JURY TRIAL

**DESCRIPTION OF ARBITRATION.** Arbitration is a method of resolving claims and disputes between parties without having to file a lawsuit in court. It is a process in which both sides present their case to a neutral third person--the arbitrator--instead of a judge or jury, to resolve the dispute. **TO THE FULLEST EXTENT PERMITTED BY LAW, BY SIGNING THIS AGREEMENT, BOTH LENDER AND I ARE VOLUNTARILY WAIVING ANY RIGHT TO A JURY TRIAL OR JUDGE TRIAL OF ALL CLAIMS AND DISPUTES COVERED BY THIS ARBITRATION AGREEMENT ("this Arbitration Agreement").**

**CLAIMS AND DISPUTES COVERED.** Except for those claims mentioned below under the heading "MATTERS NOT COVERED BY ARBITRATION," Lender and I agree that either party may elect to resolve by BINDING ARBITRATION all claims and disputes between us ("Covered Claims"). This includes, but is not limited to, all claims and disputes arising out of, in connection with, or relating to:

> My loan from Lender today; any previous loan from Lender and any previous retail credit agreement ("Retail Contract") whether open or closed-end, assigned to Lender; all documents, promotions, advertising, actions, or omissions relating to this or any previous loan or Retail Contract made by or assigned to Lender; any insurance product, service contract, or warranty purchased in connection with this or any previous loan or Retail Contract made by or assigned to Lender; any product or service offered to Lender's customers with any assistance or involvement by Lender; whether the claim or dispute must be arbitrated; the validity and enforceability of this Arbitration Agreement and the Agreement, my understanding of them, or any defenses as to the validity and enforceability of the Agreement and this Arbitration Agreement; any negotiations between Lender and me; the closing, servicing, collecting, or enforcement of any transaction covered by this Agreement; any allegation of fraud or misrepresentation; any claim based on or arising under any federal, state, or local law, statute, regulation, ordinance, or rule; any claim based on state or federal property laws; any claim based on the improper disclosure of any information protected under state or federal consumer privacy laws; any claim or dispute based on any alleged tort (wrong), including intentional torts; and any claim for injunctive, declaratory, or equitable relief.

**COVERED CLAIMS AGAINST THIRD PARTIES.** This Arbitration Agreement also covers any claim or dispute between me and any of Lender's employees, officers, agents, or directors; any of its affiliate corporations; any entities which provided insurance in connection with this or any previous transactions between me and Lender, any third parties that assigned Retail Contracts or other agreements to Lender; and any of the employees, officers, agents, or directors of such affiliates or third parties. Affiliate corporations are Lender's parent corporations, subsidiary corporations, and sister corporations. Some of Lender's affiliates are American General Finance Corporation, American General Financial Services, Inc., Merit Life Insurance Co., and Yosemite Insurance Company. In addition, if Lender becomes a party in any lawsuit that I have with any third party, whether through intervention by Lender or by motion made by me or any third party, all claims in that lawsuit between me and the third party will be subject to binding arbitration under this Agreement, provided that the third party is required to agree to resolve such claims by arbitration.

**MATTERS NOT COVERED BY ARBITRATION.** I agree that Lender does not have to initiate arbitration before exercising lawful self-help remedies or judicial remedies of garnishment, repossession, replevin, or foreclosure, but instead may proceed in court for those judicial remedies (an "Excluded Collateral Lawsuit"). I may assert in court any defenses I may have to Lender's claims in such a lawsuit, but any claim or counter claim for rescission or damages I may have arising out of, relating to, or in connection with Lender's exercise of those remedies must be arbitrated. Instead of pursuing arbitration, either Lender or I also have the option to bring a lawsuit in court to seek to recover an amount which does not exceed the total sum of $5,000.00 (including costs and attorneys' fees), provided that no relief other than such recovery is requested in such lawsuit (an "Excluded Damages Lawsuit"). If an Excluded Damages Lawsuit is filed, the other party cannot require that the claims in that lawsuit be arbitrated. An Excluded Damages Lawsuit can be brought to recover money for myself or Lender only, not for any class or group of persons having similar claims. If such an Excluded Damages Lawsuit is filed by me or Lender, and any party to that lawsuit files an amendment, counterclaim, cross-claim, or third-party claim seeking to recover more than $5,000, then that claim, counterclaim, cross-claim, or third party claim must be arbitrated in accordance with the procedures set forth in this Arbitration Agreement. Neither I nor Lender shall be deemed to have waived any arbitration rights by the fact of having exercised any self-help or judicial remedies of garnishment, repossession, replevin, or foreclosure or by having filed any claims in court seeking to recover a total sum of $5,000.00 or less.

**ARBITRATION RULES AND PROCEDURES.**

**A. ARBITRATION FORUM AND RULES.** The arbitration will be conducted under the rules and procedures of the National Arbitration Forum ("NAF") that are in effect at the time arbitration is started and under the rules set forth in this Arbitration Agreement. At my request, Lender will provide me a copy of the NAF Rules. If I lose my copy, Lender will give me another one if I ask for it. I may also obtain a copy of those rules by calling NAF at 1-800-474-2371 or by reviewing NAF's web-site at www.arb-forum.com. In the event that NAF is either unable, unwilling, or deemed not appropriate by a court to resolve a Covered Claim, or I object to the NAF for good cause, then Lender and I agree to submit all disputes to the American Arbitration Association ("AAA") for proceedings conducted pursuant to the AAA's Commercial Rules and Expedited Procedures. If there is a conflict between the rules of the NAF (or the AAA) and this Arbitration Agreement, this Arbitration Agreement will govern.

**B. SELECTION OF ARBITRATOR.** NAF maintains lists of approved arbitrators. NAF will provide Lender and me each a list of seven (7) possible arbitrators. Lender and I will each have an opportunity to strike three (3) persons from that list. I will make the first strike, and Lender and I will alternate in making strikes after that. After the last strike, the remaining person shall then serve as arbitrator.

**C. STARTING ARBITRATION.** Before I start arbitration, I agree to write to Lender at the address shown for Lender in this Agreement, unless I have received notice of a new address for Lender, and I agree to give Lender a reasonable opportunity to respond and resolve any errors. In my letter, I will give the following information: my name and account number, a description of my claim or dispute and why I believe Lender has made an error, the dollar amount of my claim or dispute, and a description of any other information I need from Lender. Before Lender starts an arbitration, it must write to me at my billing address; describe its claim or dispute; state the dollar amount of its claim or dispute; and give me a reasonable opportunity to resolve the claim or dispute. If a Covered Claim cannot be resolved in the foregoing manner, either Lender or I can start arbitration. Except as described in Paragraph E below, nothing in this Arbitration Agreement shall limit the arbitrator's ability to enforce any of my rights or impose any remedies available to me under any applicable consumer protection laws or regulations. To start an arbitration, Lender and I agree to follow the rules of the NAF (or, if applicable, the rules of the AAA).

**D. COSTS OF ARBITRATION.** The NAF and AAA charge certain fees in connection with arbitration proceedings they conduct. I may have to bear some of these fees; however, if I am not able to pay such fees or think they are too high, Lender will consider any reasonable request to bear the cost. Lender will also bear any costs Lender is required to bear by law or the terms of any other agreement with me. Each party will also pay for its own costs, including fees for attorneys, experts, and witnesses, unless otherwise provided by law or by the terms of any other agreement between the parties, to the extent permitted by applicable law.

**E. CONDUCT OF PROCEEDINGS.** In conducting the arbitration proceedings, the arbitrator shall be bound by the Federal Rules of Evidence; however, the federal or any state rules of procedure or discovery shall not bind the arbitrator. The arbitrator's findings, reasoning, decision, and award shall be set forth in writing and shall be based upon and be consistent with the law of the jurisdiction that applies to the loan or other agreement between Lender and me. The arbitrator must abide by all applicable laws protecting the attorney-client privilege, the attorney work product doctrine, or any other applicable privileges.

**SEE REVERSE SIDE FOR ADDITIONAL ARBITRATION TERMS**

**ARBITRATION AGREEMENT AND WAIVER OF JURY TRIAL (con'[redacted]**

**F. ENFORCEMENT AND APPEAL OF DECISION.** The decision and judgment of the arbitrator shall be [redacted] any court having jurisdiction over the parties and the dispute; however, for Covered Claims involving more than $100,000, any party may appeal the award, at its own cost, except as provided by law, to a three-arbitrator panel appointed by the NAF or AAA, as the case may be. That panel will reconsider from the start any aspect of the initial award that either party asserts was incorrectly decided. The decision of the panel shall be by majority vote and shall be final and binding, except as provided below. The arbitrator's (or panel's) findings, decision, and award shall be subject to judicial review on the grounds set forth in 9 U.S.C. § 10, as well as on the grounds that the findings, decision, and award are manifestly inconsistent with the terms of this Arbitration Agreement and any applicable laws or rules.

**G. LIMITATION OF PROCEEDINGS.** Lender and I further agree that the arbitrator will be restricted to resolving only the claims, disputes, or controversies between Lender and me and the other parties covered by this particular Agreement (and not by similar agreements). Arbitration is not available and shall not be conducted on a class-wide basis or consolidated with other claims or demands of other persons. I agree not to participate in a representative capacity or as a member of any class of claimants pertaining to any Covered Claim.

**H. LIMITATION OF ARBITRATOR'S AUTHORITY**: The arbitrator may award punitive damages only under circumstances where a court of competent jurisdiction could award such damages. In awarding any punitive damages, the arbitrator must abide by all applicable state and federal laws regarding the amount of such damages, and the arbitrator must state the precise amount of the punitive damages award. The arbitrator must also conduct a post-award review of any punitive damages, allowing the parties the same procedural rights and using the same standards and guidelines that would apply in a judicial proceeding in the state where the arbitration is conducted. The arbitrator may award injunctive relief that would benefit either Lender or me in connection with resolving a Covered Claim between Lender and me, but the arbitrator may not award injunctive relief for the benefit of other persons or groups of persons who are not named parties to the arbitration proceeding.

**I. LOCATION OF THE ARBITRATION.** The arbitration will take place in the county where I live unless Lender and I agree to another location. If Lender and I agree, all or a portion of the arbitration proceedings can be conducted by telephone conference.

**J. ENFORCEMENT IN COURT.** Nothing in this Arbitration Agreement shall prevent either Lender or me from enforcing all rights under this Arbitration Agreement if a Covered Claim is filed in court.

**K. FORUM SELECTION CLAUSE.** If either Lender or I need to file a lawsuit to enforce this Arbitration Agreement or to pursue claims that either may or may not be arbitratable under this Arbitration Agreement, the exclusive venue for that suit will be a state court located in the county where Lender's office is located or where I sign this Agreement, or in the federal court covering that county, unless the governing law requires suit to be filed in another location. Nothing in this paragraph shall prevent either Lender or me from enforcing its or my rights under this Arbitration Agreement if the Covered Claim is filed in court.

**ADDITIONAL INFORMATION.** I may obtain additional information about arbitration by contacting the National Arbitration Forum, Inc., at P.O. Box 50191, Minneapolis, Minnesota 55405, [redacted] www.arb-forum.com (e-mail).

**OTHER IMPORTANT AGREEMENTS.** Lender and I agree:

(a) This Arbitration Agreement does not affect any statute of limitations or claims of privilege recognized at law.

(b) The loan and insurance transactions between Lender and me and other applicable parties are transactions involving interstate commerce, using funds and other resources from outside the state.

(c) The Federal Arbitration Act applies to and governs this Agreement. State arbitration laws and procedures shall not apply to this Agreement.

(d) This Agreement applies to and runs to the benefit of Lender's and my assigns, successors, executors, heirs, and/or representatives.

(e) If any term of this Arbitration Agreement is unenforceable, the remaining terms are severable and enforceable to the fullest extent permitted by law.

(f) This Arbitration Agreement supersedes any prior arbitration agreement that may exist between Lender and me and can only be modified in writing signed by the parties.

(g) This Arbitration Agreement applies even if my loan has been cancelled, changed, modified, refinanced, paid in full, charged off, or discharged or modified in bankruptcy.

**I AGREE TO READ THIS ARBITRATION AGREEMENT CAREFULLY, BECAUSE IT LIMITS CERTAIN OF MY RIGHTS, TO THE EXTENT PERMITTED BY LAW, INCLUDING MY RIGHTS TO BRING A COURT ACTION, TO HAVE A TRIAL BY JURY, AND TO PARTICIPATE IN A CLASS ACTION OR CLASS ARBITRATION. BY SIGNING THIS AGREEMENT, I ACKNOWLEDGE THAT I HAVE READ AND RECEIVED A COPY OF THIS ARBITRATION AGREEMENT AND AGREE TO BE BOUND BY ALL OF ITS TERMS.**

**SEE FOLLOWING PAGE FOR ADDITIONAL INFORMATION**

**33. Prepayment/Termination Fee.**

[X] If checked and if (i) I pay the Total Balance on my Account within 60 months after the Date of Agreement and (ii) I terminate my Account, I agree to pay a prepayment/termination fee equal to 4.0% of the amount of my original Credit Limit ("Prepayment/Termination Fee"). There will be no Prepayment/Termination Fee if (a) my Account is refinanced or consolidated by Lender or its affiliate; (b) my Account is prepaid with insurance proceeds; (c) my Account is prepaid as a result of lawsuit, foreclosure, or acceleration; (d) Lender disapproves a request for assumption and exercises its rights under a due on sale clause, and imposition of the Prepayment/Termination Fee is prohibited by applicable law; or (e) my Account is terminated more than 60 months after the Date of Agreement.

[ ] If checked, there will be no prepayment/termination fee.

**34. Late Fee.** If I fail to pay in full the Current Payment within 15 days after the Payment Due Date, Lender may charge a Late Fee equal to 10.00 % of the entire amount of the payment.

**35. Returned Check Fee.** If I make a payment on my Account by a check or other instrument that is returned to Lender unpaid for any reason, Lender may charge a Returned Check Fee of $20.00.

**36. Reconveyance Fee.** Not applicable.

**37. Due on Sale.** If all or any part of the Property or any interest in it is sold or transferred without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by the Security Instrument; however, this option shall not be exercised if the exercise of this option by Lender is prohibited by federal law as of the date of the Security Instrument.
If Lender exercises this option, Lender will give me notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If I fail to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by the Security Instrument without further notice or demand on me.

**38. Governing Law.** The laws of the state where the Property is located and federal law govern this Agreement.

**SEE ADDITIONAL PAGES FOR IMPORTANT INFORMATION**

**AMERICAN GENERAL HOME EQUITY LINE OF CREDIT AGREEMENT (con't)** [redacted]

**BY SIGNING BELOW, I SIGNIFY THAT I HAVE READ, UNDERSTOOD, AND AGREED TO THE TERMS AND CONDITIONS OF THIS AGREEMENT, INCLUDING THE ARBITRATION AGREEMENT THAT PROVIDES, AMONG OTHER THINGS, THAT EITHER LENDER OR I MAY REQUIRE THAT CERTAIN DISPUTES BETWEEN US BE SUBMITTED TO BINDING ARBITRATION. IF LENDER OR I ELECT TO USE ARBITRATION, WE AGREE THAT WE WILL HAVE THEREBY WAIVED OUR RIGHTS TO TRIAL BY JURY OR JUDGE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THAT THE DISPUTE WILL BE DECIDED BY AN ARBITRATOR, AND THAT THE DECISION OF THE ARBITRATOR WILL BE FINAL. ARBITRATION WILL BE CONDUCTED PURSUANT TO THE RULES OF THE NATIONAL ARBITRATION FORUM, EXCEPT AS OTHERWISE PROVIDED IN THE ARBITRATION AGREEMENT.**

UNARBT (8-12-01)

I agree that, as of the date first written above ("the Date of this Agreement"), I have received and read a fully completed, legible copy of this Agreement, the Truth in Lending Insurance Disclosures, a copy of the Security Instrument, the Privacy Notice, and two copies of a Notice of Right to Cancel (if applicable), and agree to be bound thereby.

**CAUTION: IT IS IMPORTANT THAT I THOROUGHLY READ THE CONTRACT BEFORE I SIGN IT.**

x [signature] Witness

x ______________________ Witness

x [signature: Jackie M. Hill] L.S.
Borrower JACKIE M HILL

x [signature: Larry Hill] L.S.
Co-Borrower LARRY D HILL

x ______________________ L.S.
Co-Maker
Print Name: ______________________

x ______________________ L.S.
Co-Maker
Print Name: ______________________

[redacted]

**MY BILLING RIGHTS - I WILL KEEP THIS NOTICE FOR FUTURE USE**

This notice contains important information about my rights and Lender's responsibilities under the Fair Credit Billing Act.

I Will Notify Lender In Case of Errors or Questions about My Bill.

If I think my Bill is wrong, or if I need more information about a transaction on my Bill, I will write Lender on a separate sheet at the inquiry address shown on my Bill. I will write to Lender as soon as possible. Lender must hear from me no later than sixty (60) days after Lender sent me the first Bill on which the error or problem appeared. I can telephone Lender at 610-825-3550, but doing so will not preserve my rights.

In my letter, I will give Lender the following information:

1) My name and Account number.
2) The dollar amount of the suspected error.
3) Describe the error and explain, if I can, why I believe there is an error.

If I need more information, describe the item I am unsure about.

If I have authorized Lender to pay my Account Bill automatically from my checking or savings account, I can stop payment on any amount I think is wrong. To stop payment, my letter must reach Lender three (3) business days before the automatic payment is scheduled to occur.

**My Rights and Lender's Responsibilities after Lender Receives My Written Notice**

Lender must acknowledge my letter within thirty (30) days, unless Lender has corrected the error by then. Within ninety (90) days, Lender must either correct the error or explain why Lender believes my Bill was correct.

After Lender receives my letter, Lender cannot try to collect any amount I question, or report me as delinquent. Lender cannot continue to bill me for the amount I question, including Finance Charges, and Lender can apply any unpaid amount against my Credit Limit. I do not have to pay any questioned amount while Lender is investigating, but I am still obligated to pay the parts of my Bill that are not in question.

If Lender finds that Lender made a mistake on my Bill, I will not have to pay any Finance Charges related to any questioned amount. If Lender didn't make a mistake, I may have to pay Finance Charges, and I will have to make up any missed payments on the questioned amount. In either case, Lender will send me a statement of the amount I owe and the date that it is due.

If I fail to pay the amount that Lender thinks I owe, Lender may report me as delinquent. However, if Lender's explanation does not satisfy me and I write to Lender within ten (10) days telling Lender that I still refuse to pay, Lender must tell anyone Lender reports me to that I have a question about my Bill. And, Lender must tell me the name of anyone Lender reported me to. Lender must tell anyone Lender reports me to that the matter has been settled between us when it finally is.

If Lender doesn't follow these rules, Lender can't collect the first $50 of the questioned amount, even if my Bill was correct.



Borrowers' Initials JH LH

# NOTE ALLONGE

THIS ENDORSEMENT IS INCORPORATED INTO AND SHALL BE DEEMED PART OF THE NOTE TO WHICH IT IS ATTACHED.

| | |
|---|---|
| Borrower 1: | JACKIE HILL |
| Borrower 2: | LARRY HILL |
| Date of Loan: | 5/27/2005 |
| Loan Amount: | $92,000.00 |
| Property Address: | 314 E. BASIN STREET |
| City, State, Zip: | NORRISTOWN, PA 19401 |

***Pay to the order of:***

Without recourse

Springleaf Financial Services of Pennsylvania, Inc. FKA AMERICAN GENERAL CONSUMER DISCOUNT COMPANY

Stephen L. Day
Vice President

# EXHIBIT "B"

[redacted]

Prepared By:

Return To:

MG-MORTGAGE

MOR BK11493-0453
06/15/2005 03:19:39 PM.2

RCD FEE $58 50 [redacted] MONTGOMERY COUNTY ROD
ER ROD

MONTGOMERY COUNTY COMMISSIONERS REGISTRY
[redacted] NORRISTOWN
314 E BASIN ST
HILL LARRY & JACKIE M
B 125 U 019 L 2 1101 DATE: 06/01/05

(Space Above This Line For Recording Data)

# OPEN-END MORTGAGE

## THIS MORTGAGE SECURES FUTURE ADVANCES

To Borrowers whose Revolving Line of Credit Agreement and Disclosure Statement provides for a Line of Credit not exceeding $50,000 and a Variable Rate feature: **Notice to Borrower: This document contains provisions for a variable interest rate.**

THIS OPEN-END MORTGAGE ("Security Instrument") is given on 5-27-05. The Mortgagor is JACKIE M HILL

("Borrower").
**(indicate marital status)**

This Security Instrument is given to
AMERICAN GENERAL CONSUMER DISCOUNT COMPANY
which is organized and existing under the laws of Pennsylvania, and whose address is
412 W RIDGE PIKE CONSHOHOCKEN, PA 19428-0167
("Mortgagee"). Borrower may incur indebtedness to Mortgagee in amounts fluctuating from time to time up to the appraised value of the real estate secured under this Security Instrument, but not exceeding the Line of Credit set by Mortgagee (initially $ 92000.00), which amount constitutes the maximum principal amount that may be secured at any one time under this Security Instrument. This debt is evidenced by Borrower's Home Equity Line of Credit Agreement and Disclosure Statement dated the same date as this Security Instrument ("Note"), which provides for monthly payments, with the full debt, if not paid earlier, due and payable as provided in the Note. This Security Instrument secures to Mortgagee: (a) the repayment of the debt evidenced by the Note, with interest, and all renewals, extensions and modifications; (b) the payment of all other sums, with interest, advanced under paragraph 7 to protect the security of this Security Instrument; (c) the performance of Borrower's covenants and agreements under this Security Instrument and the Note; and (d) the unpaid balances of loan advances made after this Security Instrument is delivered to the recorder for record. For this purpose, Borrower does hereby mortgage, grant and convey to Mortgagee the following described property located in MONTGOMERY County, Pennsylvania:

TAX ID #[redacted]

314 E BASIN RD
NORRISTOWN PA 19401

Prior Instrument Reference: Mortgage Book No. 6939, Page 943;

**TOGETHER WITH** all the improvements now or hereafter erected on the property, and all easements, rights, appurtenances, rents, royalties, mineral, oil and gas rights and profits, water rights and stock and all fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

**BORROWER COVENANTS** that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property, and that the Property is unencumbered, except for encumbrances of record. Borrower covenants that Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

**COVENANTS.** Borrower and Mortgagee covenant and agree as follows:

**1. Payment of Principal and Interest; Prepayment and Late Charges.** Borrower shall promptly pay when due the principal of and interest on the debt evidenced by the Note and any prepayment and late charges due under the Note.

**2. Funds for Taxes and Insurance.** At the request of Mortgagee, Borrower shall begin making monthly payments into an escrow account for the payment of yearly taxes, insurance and other yearly charges imposed upon the Property.

**3. Application of Payments.** Unless applicable law provides otherwise, all payments received by Mortgagee under paragraphs 1 and 2 shall be applied as provided in the Note.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines and impositions attributable to the Property which may attain priority over this Security Instrument, and leasehold payments or ground rents, if any. Borrower shall pay these obligations in the manner prescribed by Mortgagee and on time directly to the person owed payment. Borrower shall promptly furnish to Mortgagee all notices of amounts to be paid under this paragraph. If Borrower makes these payments directly, Borrower shall promptly furnish to Mortgagee receipts evidencing the payments.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Mortgagee; (b) contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings which in the Mortgagee's opinion operate to prevent the enforcement of the lien or forfeiture of any part of the Property; or (c) secures from the holder of the lien an agreement satisfactory to Mortgagee subordinating the lien to this Security Instrument. If Mortgagee determines that any part of the Property is subject to a lien which may attain priority over this Security Instrument, Mortgagee may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within 10 days of the giving of notice.

**5. Hazard Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards for which Mortgagee requires insurance. This insurance shall be maintained in the amounts and for the periods that Mortgagee requires. The insurance carrier providing the insurance shall be chosen by Borrower subject to Mortgagee's approval which shall not be unreasonably withheld.

All insurance policies and renewals shall be acceptable to Mortgagee and shall include a standard mortgage clause. Mortgagee shall have the right to hold the policies and renewals. If Mortgagee requires, Borrower shall promptly give to Mortgagee all receipts of paid premiums and renewal notices. In the event of loss, Borrower shall give prompt notice to the insurance carrier and Mortgagee. Mortgagee may make proof of loss if not made promptly by Borrower.

Unless Mortgagee and Borrower otherwise agree in writing, insurance proceeds shall be applied to restoration or repair of the Property damaged, if the restoration or repair is economically feasible and Mortgagee's security is not lessened. If the restoration or repair is not economically feasible or Mortgagee's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. If Borrower abandons the Property, or does not answer within 30 days a notice from Mortgagee that the insurance carrier has offered to settle a claim, then Mortgagee may collect the insurance proceeds. Mortgagee may use the proceeds to repair or restore the Property or to pay sums secured by this Security Instrument, whether or not then due. The 30-day period will begin when the notice is given.

Unless the Note provides otherwise, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of the payments. If under paragraph 18 the Property is acquired by Mortgagee, Borrower's right to any insurance policies and proceeds resulting from damage to the Property prior to the acquisition shall pass to Mortgagee to the extent of the sums secured by this Security Instrument immediately prior to the acquisition.

**6. Preservation and Maintenance of Property; Leaseholds.** Borrower shall not destroy, damage or substantially change the Property, allow the Property to deteriorate or commit waste. If this Security Instrument is on a leasehold, Borrower shall comply with the provisions of the lease, and if Borrower acquires fee title to the Property, the leasehold and fee title shall not merge unless Mortgagee agrees to the merger in writing.

**7. Protection of Mortgagee's Rights in the Property; Mortgage Insurance.** If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Mortgagee's rights in the Property (such as a proceeding in bankruptcy, probate, for condemnation or to enforce laws or regulations), then Mortgagee may do and pay for whatever is necessary to protect the value of the Property and Mortgagee's rights in the Property. Mortgagee's actions may include paying any sums secured by a lien which has priority over this Security Instrument, appearing in court, paying reasonable attorneys' fees actually incurred if and as permitted by applicable law, and entering on the Property to make repairs. Although Mortgagee may take action under this paragraph 7, Mortgagee does not have to do so.

Any amounts disbursed by Mortgagee under this paragraph 7 shall become additional debt of Borrower secured by this Security Instrument. Unless Borrower and Mortgagee agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Mortgagee to Borrower requesting payment.

If Mortgagee required mortgage insurance as a condition of making the loan secured by this Security Instrument, Borrower shall pay the premiums required to maintain the insurance in effect until such time as the requirement for the insurance terminates in accordance with Borrower's and Mortgagee's written agreement or applicable law.

**8. Inspection.** Mortgagee or its agent may make reasonable entries upon and inspections of the Property. Mortgagee shall give Borrower notice at the time of or prior to an inspection specifying reasonable cause for the inspection.

**9. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of any part of the Property, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Mortgagee.

In the event of a total taking of the Property, the proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. In the event of a partial taking of the Property, unless Borrower and Mortgagee otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the proceeds multiplied by the following fractions: (a) the total amount of the sums secured immediately before the taking, divided by (b) the fair market value of the Property immediately before the taking. Any balance shall be paid to Borrower.

If the Property is abandoned by Borrower, or if, after notice by Mortgagee to Borrower that the condemnor offers to make an award or settle a claim for damages, Borrower fails to respond to Mortgagee within 30 days after the date the notice is given, Mortgagee is authorized to collect and apply the proceeds, at its option, either to restoration or repair of the Property or to the sums secured by this Security Instrument whether or not then due.

Unless the Note provides otherwise, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of such payments.

**10. Borrower Not Released; Forbearance By Mortgagee Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Mortgagee to any successor in interest of Borrower shall not operate to release the liability of the original Borrower or Borrower's successors in interest. Mortgagee shall not be required to commence proceedings against any successor in interest or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or Borrower's successors in interest. Any forbearance by Mortgagee in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

**11. Successors and Assigns Bound; Joint and Several Liability; Co-signers.** The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Mortgagee and Borrower, subject to the provisions of paragraph 16. Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note: (a) is co-signing this Security Instrument only to mortgage, grant and convey that Borrower's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Mortgagee and any other Borrower may agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without that Borrower's consent.

**12. Loan Charges.** If the loan secured by this Security Instrument is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Mortgagee may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower.

**13. Notices.** Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Mortgagee. Any notice to Mortgagee shall be given by first class mail to Mortgagee's address stated herein or any other address Mortgagee designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Mortgagee when given as provided in this paragraph.

**14. Governing Law; Severability.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

**15. Borrower's Copy.** Borrower shall be given one conformed copy of the Note and of this Security Instrument.

**16. Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Mortgagee's prior written consent, Mortgagee may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised if the exercise of this option by Mortgagee is prohibited by federal law as of the date of this Security Instrument.

If Mortgagee exercises this option, Mortgagee shall give Borrower notice of acceleration. The notice shall provide a period if not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Mortgagee may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**17. Borrower's Right to Reinstate.** To the extent required by applicable law, Borrower may have the right to have enforcement of this Security Instrument discontinued. Upon reinstatement by Borrower, this Security Instrument and the obligations secured thereby shall remain fully effective as if no acceleration had occurred.

**18. Acceleration; Remedies. Except as provided in paragraph 16, if Borrower is in default due to the occurrence of any of the events of default provided in the "DEFAULT; TERMINATION AND ACCELERATION BY MORTGAGEE" provision of the Note, Mortgagee shall give Borrower notice specifying: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. If the default is not cured on or before the date specified in the notice, Mortgagee at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Mortgagee shall be entitled to collect all expenses incurred in pursuing the remedies provided in this paragraph 18, including, but not limited to, reasonable attorneys' fees actually incurred if and as permitted by applicable law and costs of title evidence.**

**19. Mortgagee in Possession; Assignment of Rents.** Upon acceleration under paragraph 18 or abandonment of the Property, Mortgagee (by judicially appointed receiver) shall be entitled to enter upon, take possession of and manage the Property and to collect the rents of the Property including those past due. Any rents collected by Mortgagee or the receiver shall be applied first to payment of the costs of management of the Property and collection of rents, including, but not limited to, receiver's fees, premiums on receiver's bonds and reasonable attorneys' fees if and as permitted by applicable law, and then to the sums secured by this Security Instrument. Nothing herein contained shall be construed as constituting Mortgagee a "mortgagee in possession," unless Mortgagee shall have entered into and shall remain in actual possession of the Property.

**20. Release.** Upon payment of all sums secured by this Security Instrument, Mortgagee shall discharge this Security Instrument. Borrower shall pay any recordation costs.

**21. Advances to Protect Security.** This Security Instrument shall secure the unpaid balance of advances made by Mortgagee, with respect to the Property, for the payment of taxes, assessments, insurance premiums and costs incurred for the protection of the Property.

**22. Interest Rate After Judgment.** Borrower agrees that the interest rate payable after a judgment is entered on the Note or in an action of mortgage foreclosure shall be the rate payable from time to time under the Note.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument.

Witnesses: X Dana Rowe

X Jackie M. Hill (Seal)
Borrower JACKIE M HILL

_______________ (Seal)
Borrower

COMMONWEALTH OF PENNSYLVANIA, COUNTY OF MOTGOMERY ss:

On this 27th day of May, 2005, before me, Sharon M Smyth undersigned officer, personally appeared JACKIE M HILL

known to me (or satisfactorily proven) to be the PERSON whose NAME IS subscribed to the within instrument and acknowledged that SHE executed the same for the purposes therein contained.

WITNESS my hand and official seal, the day and year aforesaid.

(SEAL)

My Commission expires:
4/8/2006

Sharon M Smyth
Notary Public of Pennsylvania

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Sharon M. Smyth, Notary Public
Whitemarsh Twp., Montgomery County
My Commission Expires Apr. 8, 2006
Member, Pennsylvania Association of Notaries

## CERTIFICATE OF RESIDENCE

I, DANA M ROWE, of AMERICAN GENERAL CONSUMER DISCOUNT COMPANY Mortgagee named in the foregoing mortgage, hereby certify that the correct residence address of said Mortgagee is 412 W RIDGE PIKE, CONSHOHOCKEN, PA 19428-0167.

Witness my hand, this 27th day of May, 2005.

Dana Rowe

Agent of Mortgagee

## Schedule A

Report Number: [redacted]
Client Number:
Customer: Hill, Larry & Hill, Jackie M.

ALL THAT CERTAIN lot or parcel of land, with the buildings and improvements thereon erected, SITUATE in the Borough of Norristown, County of Montgomery and Commonwealth of Pennsylvania bounded and described according to a Subdivision Plan prepared by Barry Isett & Associates, P.C., dated January 10, 1989 as recorded in the Office of the Recorder of Deeds of Montgomery County in Plan Book A-51 page 96, as follows, to wit:

BEGINNING at a point on the Southwesterly side of E. Basin Street (50.00 feet wide), a corner of this and Lot No. 3, as shown on said Plan, which point is measured the two following courses and distances from a point of curve on the Northwesterly side of Green Valley Road (40.00 feet wide), as shown on said Plan; (1) leaving Green Valley Road on the arc of a curve, curving to the left, in a Northeastwardly to Northwestwardly direction, having a radius of 15.00 feet, the arc distance of 29.62 feet to a point of tangent on the Southwesterly side of E. Basin Street, and (2) North 41 degrees, 20 minutes, West along the Southwesterly side of E. Basin Street 134.69 feet to the point of beginning; thence extending from said point of beginning South 48 degrees, 40 minutes West along line of Lot No. 3, 123.45 feet to a point a corner in line of land of Nicholas Joseph Epifanio, as shown on said Plan; thence extending North 30 degrees, 30 minutes West along line of land of Epifanio 20.36 feet to a point a corner of Lot No. 1, as shown on said Plan; thence extending North 48 degrees, 40 minutes East along line of Lot No. 1, 119.62 feet to a point a corner on the Southwesterly side of E. Basin Street, aforesaid; thence extending South 41 degrees, 20 minutes East along the Southwesterly side of Basin Street 20.00 feet to a point a corner of Lot No. 3, aforesaid, the first mentioned point and place of beginning.

BEING Lot No. 2, as shown on said Plan.

Parcel #[redacted]




[redacted] [redacted]

# EXHIBIT "C"

WHEN RECORDED MAIL TO:
SPRINGLEAF FINANCIAL SERVICES OF PENNSYLVANIA, INC.
FKA American General Consumer Discount Co.
NORTHTOWNE PLAZA
42 E GERMANTOWN PIKE
EAST NORRITON TWP, PA 19401-1512

Springleaf Financial

This instrument was prepared by SCOTT FALLON

______________ [Space above This Line for Recording Data] [redacted]

# LOAN MODIFICATION AGREEMENT

**(For Modifying Non Recourse Home Equity Line of Credit** [redacted]

| Security Instrument Filing Data | |
|---|---|
| Instrument Dated | MAY 27, 2005 |
| Recorded on | JUNE 5, 2005 |
| Office Recorded in | RECORDER OF DEEDS |
| County | MONTGOMERY |
| Location | NORRISTOWN, PA 19401 |
| Book/Volume/Liber | 11493 |
| Page | 453 |
| File | |
| Doc/Instrument Number | |

This Loan Modification Agreement ("Agreement"), effective on 12/01/13 (the "Modification Effective Date") by and between ______________
JACKIE M HILL
______________
("Borrower") and SPRINGLEAF FINANCIAL SERVICES OF PENNSYLVANIA, INC. FKA American General Consumer Discount Co. ("Lender"), modifies, amends, and supplements (to the extent this Agreement is inconsistent with their terms): (1) the Mortgage, Deed of Trust, Deed to Secure Debt, or Security Deed ("Security Instrument"), as set forth herein above, and (2) the Home Equity Line of Credit Agreement ("Note"), dated MAY 27, 2005, which covers the real and personal property described in the Security Instrument and defined therein as the "Property" located at:

314 E BASIN ST NORRISTOWN ______________,

| | | |
|---|---|---|
| Co# [redacted] | Br[redacted] | ML[redacted] |



[redacted]

HILL
AMGN

If this Agreement is to be recorded, the real property described is set forth as follows:

314 E BASIN ST
NORRISTOWN[redacted]
PARCEL ID [redacted]

This Agreement also supersedes and replaces any prior loan modification agreement(s) between Lender and Borrower as of the effective date of this Agreement.

Terms not defined in this Agreement are as defined in the Note and/or Security Agreement.

As of the Modification Effective Date, the amount of the principal balance payable under the Note and the Security Instrument (the "Unpaid Principal Balance") will be $ 111184.19. In consideration of the mutual promises and agreements contained herein, Borrower and Lender (together the "Parties") agree that beginning on the Modification Effective Date, and after both Parties have executed this Agreement, (notwithstanding anything to the contrary contained in the Note or Security Instrument):

1. **ANNUAL PERCENTAGE RATE.** Borrower promises to pay the Principal Balance, plus interest, to the order of Lender. $ 0.00 of the Principal Balance shall be deferred (the "Deferred Principal Balance") and Borrower will not pay interest or make monthly payments on this amount. The Principal Balance less the Deferred Principal Balance shall be referred to as the "Interest Bearing Principal Balance" and this amount is $ 111184.19. The unpaid and deferred interest that has not been capitalized (the "Deferred Interest") will be $ 0.00. Interest at the Annual Percentage Rate of 5.06% will begin to accrue on the Interest Bearing Principal Balance as of 11/01/13 and the first new monthly payment on the Interest Bearing Principal Balance will be due on 12/01/13. **Assuming no additional sums are advanced under the Note and assuming that all minimum monthly payments are made in full and on time, my payment schedule, including my minimum monthly payments and APR based on the current principal balance, will be:**

| Months | Interest Rate | Interest Rate Change Date | Monthly Payment | Estimated Monthly Escrow Payment* | Total Monthly Payment* (if escrowed) | Payment Begins On |
|---|---|---|---|---|---|---|
| 001 - 036 | 5.06 | 11/01/13 | 540.55 | 382.77 | 923.32 | 12/01/13 |
| 037 - 480 | 6.46 | 11/01/16 | 642.83 | May adjust periodically | May adjust periodically | 12/01/16 |
| | | | | May adjust periodically | May adjust periodically | |
| | | | | May adjust periodically | May adjust periodically | |

*The escrow payments may be adjusted periodically in accordance with applicable law and therefore my total monthly payment may change accordingly.

Minimum monthly payments will be paid until Principal Balance and accrued interest are paid in full.

2. Repayment Term. The assumed repayment term of the Note (and Security Instrument) is 480 months from the date of the Agreement.

3. Minimum monthly payments will continue to be calculated in the manner set forth in the Note. Borrower must pay the minimum monthly payment shown on each monthly statement by the payment due date.

4. Place of Payment. Borrower must continue to make the monthly payments in the manner and at such place as Lender may require.

5. Funds for Escrow Items. Borrower and Lender expressly covenant and agree, that until all Indebtedness owing on said Note and Security Instrument (Hereinafter referred to as "Loan Documents") or any renewal thereof is paid, Borrower will keep all Required Insurance premiums, taxes, governmental assessments, levies, and charges against said premises that could encumber said Real Estate paid as they become due. Borrower's failure to keep such insurance coverage, taxes and charges current, as described in the preceding sentence, may result, at Lender's option, without waiving any of its other rights or remedies and after giving any notice required by law, in Lender paying said insurance, taxes or charges, and the amount so paid, with interest thereon at the rate described in said Loan Documents; will be and become a part of the indebtedness secured by this Agreement. Lender may elect, the law may require, or Borrower may request that Lender maintain an escrow fund for payment of real estate taxes, assessments, insurance premiums, or other obligations that might encumber the Real Estate if not timely paid when due. If so elected, if required by law, or if Borrower's request is granted, Borrower will pay to Lender on the day payments are due under the Loan Documents as amended by this Agreement, until the Loan is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over the Mortgage as a lien or encumbrance on the property that secures Borrower's Note ("Property"); (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under the Loan Documents; (d) mortgage insurance premiums, if any, or any sums payable to Lender in lieu of the payment of mortgage insurance premiums in accordance with the Loan Documents; and (e) any community association dues, fees, and assessments that Lender requires to be escrowed. These items are called "Escrow Items." Borrower shall promptly furnish to Lender all notices of amounts to be paid under this section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in the Loan Documents, as the phrase "covenant and agreement" is used in the Loan Documents. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under the Loan Documents and this Agreement and pay such amount and Borrower shall then be obligated to repay to Lender any such amount and interest as allowed by law. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with the Loan Documents, and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this section.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under the Real Estate Settlement Procedures Act ("RESPA"), and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying

the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. Unless an agreement is made in writing or applicable law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Lender and Borrower can agree in writing, however, that interest shall be paid on the Funds. Lender shall provide Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA but generally in no more than 12 monthly payments, but Lender may in its sole discretion allow Borrower to make up the initial shortage at the time of the execution of this Agreement in no more than 60 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but generally in no more than 12 monthly payments, but Lender may in its sole discretion allow Borrower to make up the initial deficiency at the time of the execution of this Agreement in no more than 60 monthly payments.

Upon payment in full of all sums secured by the Loan Documents, Lender shall promptly refund to Borrower any Funds held by Lender.

6. Application of Payments. All payments will be applied in the following order: first to any Other Charges, then to any Late Charges, then to any Credit Insurance Premiums, then to any Escrow Items, then to any Finance Charges, and finally, to any Principal Balance.

7. If all or any part of the Property or any interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by the Security Instrument.

   If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by the Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by the Security Instrument without further notice or demand on Borrower.

8. Borrower also will comply with all other covenants, agreements, and requirements of the Security Instrument, including without limitation, Borrower's covenants and agreements to make all payments of taxes, insurance premiums, assessments, escrow items, impounds, and all other payments that Borrower is obligated to make under the Security Instrument; however, the following terms and provisions of the Note and Security Instrument are forever canceled, null and void, as of the date of this Agreement:

   (a) All terms and provisions of the Note and Security Instrument (if any) providing for, implementing, or relating to, any change or adjustment in the rate of interest payable under the Note; and

   (b) All terms and provisions of any adjustable rate rider, where applicable, or other instrument or document that is affixed to, wholly or partially incorporated into, or is part of, the Note or Security Instrument and that contains any such terms and provisions as those referred to in (a) above.

9. Borrower understands and agrees that:

(a) All the rights and remedies, stipulations, and conditions contained in the Security Instrument relating to default in the making of payments under the Security Instrument shall also apply to default in the making of the modified payments hereunder.

(b) All covenants, agreements, stipulations, and conditions in the Note and Security Instrument shall be and remain in full force and effect, except as herein modified, and none of the Borrower's obligations or liabilities under the Note and Security Instrument shall be diminished or released by any provisions hereof, nor shall this Agreement in any way impair, diminish, or affect any of Lender's rights under or remedies on the Note and Security Instrument, whether such rights or remedies arise thereunder or by operation of law. Also, all rights of recourse to which Lender is presently entitled against any property or any other persons in any way obligated for, or liable on, the Note and Security Instrument are expressly reserved by Lender.

(c) Borrower has no right of set-off or counterclaim, or any defense to the obligations of the Note or Security Instrument.

(d) Nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the Note and Security Instrument.

(e) ☐ If checked, I was discharged in a bankruptcy proceeding subsequent to the execution of the Note and Security Instrument. Based on this representation, notwithstanding anything to the contrary in the Agreement, Lender agrees that I will not have personal liability on the Note and Security Instrument pursuant to this Agreement.

(f) Borrower agrees to make and execute such other documents or papers as may be necessary or required to effectuate the terms and conditions of this Agreement which, if approved and accepted by Lender, shall bind and inure to the heirs, executors, administrators, and assigns of the Borrower.

This Agreement modifies the Note and Security Instrument referenced above as expressly provided herein. Except where otherwise specifically provided in this Agreement, the Note and Security Instrument will remain unchanged, and Borrower and Lender will be bound by, and comply with, all of the terms and provisions thereof, as amended by this Agreement.

In Witness Whereof, Lender and Borrower have executed this Agreement.

Springleaf Financial of PA
Name of Lender

By: ______________________

______________________ 11/4/13
Witness Signature Date

______________________ (Seal)
Borrower
JACKIE M HILL

______________________ (Seal)
Borrower
LARRY D HILL

______________________ (Seal)
Witness Signature Date

COMMONWEALTH OF PENNSYLVANIA )
) SS
COUNTY OF Montgomery )

On this, the 4th day of November, 2013, before me Lisa D Walton, the undersigned officer, personally appeared
Jackie M Hill
Larry D Hill
known to me (or satisfactorily proven) to be the person whose name are subscribed to the within instrument, and acknowledged that They executed the same for the purposes therein contained.

In witness whereof, I hereunto set my hand and official seal. [signature]
LISA D. WALTON
Title of Officer NOTARY

NOTARIAL SEAL
LISA D WALTON
Notary Public
PLYMOUTH TWP., MONTGOMERY COUNTY
My Commission Expires Sep 1, 2014

CERTIFICATE OF RESIDENCE

I, SCOTT FALLON, of
SPRINGLEAF FINANCIAL SERVICES OF PENNSYLVANIA, INC.
Lender named in the foregoing Loan Modification Agreement hereby certify that the correct residence address of said Lender is
42 E GERMANTOWN PIKE EAST NORRITON TWP, PA 19401-1512

Witness my hand this 30th day of October, 2013.

[signature]
Agent of Lender

# EXHIBIT "D"



RECORDER OF DEEDS
MONTGOMERY COUNTY
*Nancy J. Becker*

One Montgomery Plaza
Swede and Airy Streets ~ Suite 303
P.O. Box 311 ~ Norristown, PA 19404
[redacted]

**MTG BK 13995 PG 01528 to 01530**
INSTRUMENT # : 2015060973
RECORDED DATE: 08/13/2015 01:26:37 PM

[redacted]

**MONTGOMERY COUNTY ROD**

## OFFICIAL RECORDING COVER PAGE

Page 1 of 3

**Document Type:** Mortgage Assignment
**Document Date:** 08/13/2015
**Reference Info:**

**Transaction #:** [redacted]
**Document Page Count:** 2
**Operator Id:** ebossard

**RETURN TO:** (Simplifile)
Nationwide Title Clearing
2100 Alternate 19 N
Palm Harbor, FL 34683
(727) 771-4000

**PAID BY:**
NATIONWIDE TITLE CLEARING

*** PROPERTY DATA:**
Parcel ID #: [redacted]
Address: 314 E BASIN ST

NORRISTOWN PA
19401
Municipality: Norristown Borough (100%)
School District: Norristown Area

*** ASSOCIATED DOCUMENT(S):**
MTG BK 11493 PG 00453

**CONSIDERATION/SECURED AMT: 92000**

**FEES / TAXES:**
Recording Fee:Mortgage Assignment $76.00
**Total:** $76.00

MTG BK 13995 PG 01528 to 01530
Recorded Date: 08/13/2015 01:26:37 PM

I hereby CERTIFY that this document is recorded in the Recorder of Deeds Office in Montgomery County, Pennsylvania.

RECORDER'S OFFICE MONTGOMERY COUNTY, PA

**Nancy J. Becker**
**Recorder of Deeds**

# PLEASE DO NOT DETACH

THIS PAGE IS NOW PART OF THIS LEGAL DOCUMENT

**NOTE: If document data differs from cover sheet, document data always supersedes.**
***COVER PAGE DOES NOT INCLUDE ALL DATA, PLEASE SEE INDEX AND DOCUMENT FOR ANY ADDITIONAL INFORMATION.**

*Description: Montgomery,PA Mortgage - Book.Page 13995.1528 Page: 1 of 3*
[redacted] :

**Prepared By:**
**E.Lance/NTC, 2100 Alt. 19 North,**
**Palm Harbor, FL 34683**
[redacted]

When Recorded Return To:
Nationstar Mortgage LLC
C/O Nationwide Title Clearing, Inc.
2100 Alt. 19 North
Palm Harbor, FL 34683

[redacted]

MONTGOMERY COUNTY COMMISSIONERS REGISTRY
[redacted] NORRISTOWN BOROUGH
314 E BASIN ST
HILL LARRY & JACKIE M $15.00
B 125 L 2 U 019 1101 08/13/2015 JU

# ASSIGNMENT OF MORTGAGE

**Regarding this instrument, contact Nationstar Mortgage, LLC, 4000 Horizon Way, Irving, TX 75063, telephone [redacted] which is responsible for receiving payments.**

**FOR GOOD AND VALUABLE CONSIDERATION,** the sufficiency of which is hereby acknowledged, the undersigned, **SPRINGLEAF FINANCIAL SERVICES OF PENNSYLVANIA, INC., F/K/A AMERICAN GENERAL CONSUMER DISCOUNT COMPANY, WHOSE ADDRESS IS 601 N.W. SECOND St., EVANSVILLE, IN, 47708, (ASSIGNOR),** by these presents does convey, grant, assign, transfer and set over the described Mortgage therein together with all interest secured thereby, all liens, and any rights due or to become due thereon to **U.S. BANK NATIONAL ASSOCIATION, AS INDENTURE TRUSTEE FOR SPRINGLEAF MORTGAGE LOAN TRUST 2013-3, WHOSE ADDRESS IS C/O 4000 HORIZON WAY, IRVING, TX 75063, ITS SUCCESSORS AND ASSIGNS, (ASSIGNEE).**

Said Mortgage dated 05/27/2005, in the amount of $92,000.00 made by **JACKIE M. HILL** to **AMERICAN GENERAL CONSUMER DISCOUNT COMPANY** recorded on 06/15/2005, in the Office of the Recorder of Deeds of **MONTGOMERY** County, in the State of **Pennsylvania**, in **Book 11493, Page 0453 and Instrument # 2005082014**.

Property is more commonly known as: 314 E BASIN RD NORRISTOWN BORO, NORRISTOWN, PA 19401.

**Dated this 13th day of August in the year 2015**
**SPRINGLEAF FINANCIAL SERVICES OF PENNSYLVANIA, INC., F/K/A AMERICAN GENERAL CONSUMER DISCOUNT COMPANY**

By: ______________________________
**KRISTINA EMMANOUIL**
**VICE PRESIDENT**

All persons whose signatures appear above have qualified authority to sign and have reviewed this document and supporting documentation prior to signing.

[redacted]

[redacted]

STATE OF FLORIDA COUNTY OF PINELLAS
The foregoing instrument was acknowledged before me on this 13th day of August in the year 2015, by Kristina Emmanouil as VICE PRESIDENT of SPRINGLEAF FINANCIAL SERVICES OF PENNSYLVANIA, INC., F/K/A AMERICAN GENERAL CONSUMER DISCOUNT COMPANY, who, as such VICE PRESIDENT being authorized to do so, executed the foregoing instrument for the purposes therein contained. He/she/they is (are) personally known to me.

**NICOLE BALDWIN**
**COMM EXPIRES: 08/05/2016**

Nicole Baldwin
Notary Public State of Florida
My Commission # EE 222285
Expires August 5, 2016

Assignment of Mortgage from:
**SPRINGLEAF FINANCIAL SERVICES OF PENNSYLVANIA, INC., F/K/A AMERICAN GENERAL CONSUMER DISCOUNT COMPANY, WHOSE ADDRESS IS 601 N.W. SECOND St., EVANSVILLE, IN, 47708, (ASSIGNOR),**
to:
**U.S. BANK NATIONAL ASSOCIATION, AS INDENTURE TRUSTEE FOR SPRINGLEAF MORTGAGE LOAN TRUST 2013-3, WHOSE ADDRESS IS C/O 4000 HORIZON WAY, IRVING, TX 75063, ITS SUCCESSORS AND ASSIGNS, (ASSIGNEE)**

Mortgagor: **JACKIE M. HILL**

All that certain lot or piece of ground situated in
Mortgage Premise: 314 E BASIN RD NORRISTOWN BORO
NORRISTOWN, PA 19401
MONTGOMERY
(Borough or Township, if stated), Commonwealth of Pennsylvania.
Being more particularly described in said Mortgage.

**Certificate of Residence**

I, **Kristina Emmanouil**, do certify that the precise address of the within named Assignee is:
**U.S. BANK NATIONAL ASSOCIATION, AS INDENTURE TRUSTEE FOR SPRINGLEAF MORTGAGE LOAN TRUST 2013-3, WHOSE ADDRESS IS C/O 4000 HORIZON WAY, IRVING, TX 75063, ITS SUCCESSORS AND ASSIGNS, (ASSIGNEE)**

**KRISTINA EMMANOUIL**
**VICE PRESIDENT**

All persons whose signatures appear above have qualified authority to sign and have reviewed this document and supporting documentation prior to signing.

[redacted]



[redacted]

Prepared By:
Bernardo Hernandez,
NATIONSTAR MORTGAGE DBA MR. COOPER
8950 CYPRESS WATERS BLVD

COPPELL, TX 75019
[redacted]

When Recorded Return To:
DOCUMENT ADMINISTRATION
NATIONSTAR MORTGAGE DBA MR. COOPER
8950 CYPRESS WATERS BLVD
COPPELL, TX 75019

[redacted]

---

[redacted]

**CORPORATE ASSIGNMENT OF MORTGAGE**

**Montgomery, Pennsylvania**
**SELLER'S SERVICING**[redacted]"HILL"

Date of Assignment: January 17th, 2018
Assignor: U.S. BANK NATIONAL ASSOCIATION AS INDENTURE TRUSTEE FOR SPRINGLEAF MORTGAGE LOAN TRUST 2013-3, BY NATIONSTAR MORTGAGE LLC, ITS ATTORNEY-IN-FACT
Assignee: MADISON REVOLVING TRUST 2017

I hereby certify the precise address of the within named Assignor is 8950 CYPRESS WATERS BLVD, COPPELL, TX 75019.

I hereby certify the precise address of the within named Assignee is P.O. BOX 296, MADISON, WI 53701.

Executed By: JACKIE M HILL To: AMERICAN GENERAL CONSUMER DISCOUNT COMPANY
Date of Mortgage: 05/27/2005 Recorded: 06/15/2005 in Book/Reel/Liber: 11493 Page/Folio: 0453 as Instrument/Document: 2005082014 In the County of Montgomery, State of Pennsylvania.

-Assigned by AMERICAN GENERAL CONSUMER DISCOUNT COMPANY TO U.S. BANK NATIONAL ASSOCIATION AS INDENTURE TRUSTEE FOR SPRINGLEAF MORTGAGE LOAN TRUST 2013-3 Dated: 08/13/2015 Recorded: 08/13/2015 in Book/Reel/Liber: 13995 Page/Folio: 01528 as Instrument/Document: 2015060973
-POWER OF ATTORNEY Dated: 05/26/2016 Recorded: 07/26/2016 in Book/Reel/Liber: 0253 Page/Folio: 00212 as Instrument/Document: 2016055012, between U.S. Bank National Association, as Indenture Trustee for Springleaf Mortgage Loan Trust 2013-3 and NATIONSTAR MORTGAGE LLC, Property Address: 314 E BASIN RD, NORRISTOWN, PA 19401 in the Borough of NORRISTOWN

[redacted]

[redacted]

CORPORATE ASSIGNMENT OF MORTGAGE Page 2 of 2

I do certify that the precise address of MADISON REVOLVING TRUST 2017 is P.O. BOX 296, MADISON, WI 53701
Attested By: ______________________

Mohamed Hameed

KNOW ALL MEN BY THESE PRESENTS, that for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the said Assignor hereby assigns unto the above-named Assignee, the said Mortgage having an original principal sum of $92,000.00 with interest, secured thereby, and the full benefit of all the powers and of all the covenants and provisos therein contained, and the said assignor hereby grants and conveys unto the said assignee, the assignor's interest under the Security Instrument.

TO HAVE AND TO HOLD the said Security Instrument, and the said property unto the said assignee forever, subject to the terms contained in said Security Instrument.

U.S. BANK NATIONAL ASSOCIATION AS INDENTURE TRUSTEE FOR SPRINGLEAF MORTGAGE LOAN TRUST 2013-3, BY NATIONSTAR MORTGAGE LLC, ITS ATTORNEY-IN-FACT
On January 17th, 2018

By: ______________________
MOHAMED HAMEED, Vice-President

STATE OF Texas
COUNTY OF Dallas

On January 17th, 2018, before me, OMAR BASPED, a Notary Public in and for Dallas in the State of Texas, personally appeared MOHAMED HAMEED, Vice-President of U.S. BANK NATIONAL ASSOCIATION AS INDENTURE TRUSTEE FOR SPRINGLEAF MORTGAGE LOAN TRUST 2013-3, BY NATIONSTAR MORTGAGE LLC, ITS ATTORNEY-IN-FACT, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity, and that by his/her/their signature on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal,

______________________
OMAR BASPED
Notary Expires: 12/04/2019 #130458850

NOTARY PUBLIC STATE OF TEXAS
OMAR BASPED
Notary Public, State of Texas
Comm. Expires 12-04-2019
Notary ID 130458850

(This area for notarial seal)

[redacted]

## Legal Description

ALL THAT CERTAIN lot or parcel of land, with the buildings and improvements thereon erected, SITUATE in the Borough of Norristown, County of Montgomery and Commonwealth of Pennsylvania bounded and described according to a Subdivision Plan prepared by Barry Isett & Associates, P.C., dated January 10, 1989 as recorded in the Office of the Recorder of Deeds of Montgomery County in Plan Book A-51 page 98, as follows, to wit:

BEGINNING at a point on the Southwesterly side of E. Basin Street (50.00 feet wide), a corner of this and Lot No. 3, as shown on said Plan, which point is measured the two following courses and distances from a point of curve on the Northwesterly side of Green Valley Road (40.00 feet wide), as shown on said Plan; (1) leaving Green Valley Road on the arc of a curve, curving to the left, in a Northeastwardly to Northwestwardly direction, having a radius of 15.00 feet, the arc distance of 29.62 feet to a point of tangent on the Southwesterly side of E. Basin Street, and (2) North 41 degrees, 20 minutes, West along the Southwesterly side of E Basin Street 134.69 feet to the point of beginning; thence extending from said point of beginning South 48 degrees, 40 minutes West along line of Lot No. 3, 123.45 feet to a point a corner in line of land of Nicholas Joseph Epifanio, as shown on said Plan; thence extending North 30 degrees, 30 minutes West along line of land of Epifanio 20.36 feet to a point a corner of Lot No. 1, as shown on said Plan; thence extending North 48 degrees, 40 minutes East along line of Lot No. 1, 119.62 feet to a point a corner on the Southwesterly side of E. Basin Street, aforesaid; thence extending South 41 degrees, 20 minutes East along the Southwesterly side of Basin Street 20.00 feet to a point a corner of Lot No. 3, aforesaid, the first mentioned point and place of BEGINNING.

FOR INFORMATIONAL PURPOSES ONLY: Being known as 314 East Basin Street, Norristown PA 19401

Parcel #[redacted]

Prepared By:
Douglas Keaton,
NATIONSTAR MORTGAGE DBA MR. COOPER
8950 CYPRESS WATERS BLVD
COPPELL, TX 75019
[redacted]

When Recorded Return To:
DOCUMENT ADMINISTRATION
NATIONSTAR MORTGAGE DBA MR. COOPER
8950 CYPRESS WATERS BLVD
COPPELL, TX 75019
[redacted]

[redacted]

**CORPORATE ASSIGNMENT OF MORTGAGE**

**Montgomery, Pennsylvania**
**SELLER'S SERVIC** [redacted] HILL"

Date of Assignment: April 2nd, 2025
Assignor: NATIONSTAR MORTGAGE LLC AS ATTORNEY-IN-FACT FOR MADISON REVOLVING TRUST 2017
Assignee: WILMINGTON SAVINGS FUND SOCIETY, FSB, AS INDENTURE TRUSTEE WITH RESPECT TO CIM TRUST 2023-R1

Executed By: JACKIE M HILL To: AMERICAN GENERAL CONSUMER DISCOUNT COMPANY
Date of Mortgage: 05/27/2005 Recorded: 06/15/2005 in Book/Reel/Liber: 11493 Page/Folio: 463 as Instrument/Document: 2005082014 In the County of Montgomery, State of Pennsylvania.

-Assigned by AMERICAN GENERAL CONSUMER DISCOUNT COMPANY TO U.S. BANK NATIONAL ASSOCIATION AS INDENTURE TRUSTEE FOR SPRINGLEAF MORTGAGE LOAN TRUST 2013-3 Dated: 08/13/2015 Recorded: 08/13/2015 in Book/Reel/Liber: 13995 Page/Folio: 01528 as Instrument/Document: 2015060973
-POWER OF ATTORNEY Dated: 05/26/2016 Recorded: 07/26/2016 in Book/Reel/Liber: 0253 Page/Folio: 00212 as Instrument/Document: 2016055012, between U.S. Bank National Association, as Indenture Trustee for Springleaf Mortgage Loan Trust 2013-3 and NATIONSTAR MORTGAGE LLC,
Property Address: 314 E BASIN RD, NORRISTOWN, PA 19401 in the Borough of NORRISTOWN

I do certify that the precise address of WILMINGTON SAVINGS FUND SOCIETY, FSB, AS INDENTURE TRUSTEE WITH RESPECT TO CIM TRUST 2023-R1 is 11819 MIAMI ST.,, SUITE 100, OMAHA, NE 68164
Attested By: ______________________

Tsedale Alemu

KNOW ALL MEN BY THESE PRESENTS, that for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the said Assignor hereby assigns unto the above-named Assignee, the said Mortgage having an original principal sum of $92,000.00 with interest, secured

[redacted]

CORPORATE ASSIGNMENT OF MORTGAGE Page 2 of 2
thereby, and the full benefit of all the powers and of all the covenants and provisos therein contained, and the said assignor hereby grants and conveys unto the said assignee, the assignor's interest under the Security Instrument.

TO HAVE AND TO HOLD the said Security Instrument, and the said property unto the said assignee forever, subject to the terms contained in said Security Instrument.

NATIONSTAR MORTGAGE LLC AS ATTORNEY-IN-FACT FOR MADISON REVOLVING TRUST 2017
On April 2nd, 2025

By:______________________________
TSEDALE ALEMU, Vice-President

STATE OF Texas
COUNTY OF Dallas

On April 2nd, 2025, before me, SYLVIA RAMIREZ, a Notary Public in and for Dallas in the State of Texas, personally appeared TSEDALE ALEMU , Vice-President of MADISON REVOLVING TRUST 2017, BY NATIONSTAR MORTGAGE LLC, ITS ATTORNEY-IN-FACT, personally known to me to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity, and that by his/her/their signature on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal,

______________________________
SYLVIA RAMIREZ
Notary Expires: 03/13/2027 #131921660

NOTARY PUBLIC STATE OF TEXAS
SYLVIA RAMIREZ
Notary Public, State of Texas
Comm. Expires 03-13-2027
Notary ID 131921660

(This area for notarial seal)

[redacted]



RECORDER OF DEEDS
MONTGOMERY COUNTY
*Jeanne Sorg*

One Montgomery Plaza
Swede and Airy Streets ~ Suite 303
P.O. Box 311 ~ Norristown, PA 19404
[redacted]

**MTG BK 16324 PG 00419 to 00421**
INSTRUMENT # : 2026064608
RECORDED DATE: 10/29/2026 01:46:31 PM

[redacted]

**MONTGOMERY COUNTY ROD**

## OFFICIAL RECORDING COVER PAGE

Page 1 of 3

| | |
|---|---|
| **Document Type:** Mortgage Assignment | **Transaction #:** [redacted] |
| **Document Date:** 10/13/2026 | **Document Page Count:** 2 |
| **Reference Info:** | **Operator Id:** djohnson1 |
| **RETURN TO: (**Simplifile)<br>Meridian Asset Services<br>140 Fountain N Pkwy Ste 100<br>Saint Petersburg, FL 33716-1285<br>(239) 351-2442 | **PAID BY:**<br>MERIDIAN ASSET SERVICES |

*** PROPERTY DATA:**

| | |
|---|---|
| Parcel ID #: | [redacted] |
| Address: | 314 E BASIN ST<br><br>NORRISTOWN PA<br>19401 |
| Municipality: | Norristown Borough (100%) |
| School District: | Norristown Area |

*** ASSOCIATED DOCUMENT(S):**
MTG BK 11493 PG 00453 POA BK 0284 PG 00185

**FEES / TAXES:**

| | |
|---|---|
| Recording Fee:Mortgage Assignment | $81.75 |
| Misc Fee | $5.00 |
| **Total:** | $86.75 |

MTG BK 16324 PG 00419 to 00421
Recorded Date: 10/29/2026 01:46:31 PM

I hereby CERTIFY that this document is recorded in the Recorder of Deeds Office in Montgomery County, Pennsylvania.

RECORDER'S OFFICE MONTGOMERY COUNTY, PA

**Jeanne Sorg**
**Recorder of Deeds**

**Rev1 2016-01-29**

# PLEASE DO NOT DETACH

THIS PAGE IS NOW PART OF THIS LEGAL DOCUMENT

**NOTE: If document data differs from cover sheet, document data always supersedes.**

***COVER PAGE DOES NOT INCLUDE ALL DATA, PLEASE SEE INDEX AND DOCUMENT FOR ANY ADDITIONAL INFORMATION**

Prepared By and Return To:
**Karine Sharma**
Meridian Asset Services, LLC
140 Fountain Parkway N Suite 100
St. Petersburg, FL 33716
(239) 351-2442

MONTGOMERY COUNTY COMMISSIONERS REGISTRY
[redacted] NORRISTOWN BOROUGH
314 E BASIN ST
HILL LARRY & JACKIE M $15.00
B 125 L 2 U 019 1101 10/27/2026 JG

[redacted]

Space above for Recorder's use [redacted]

## ASSIGNMENT OF MORTGAGE

FOR GOOD AND VALUABLE CONSIDERATION, the sufficiency of which is hereby acknowledged, the undersigned, **WILMINGTON SAVINGS FUND SOCIETY, FSB, AS INDENTURE TRUSTEE WITH RESPECT TO CIM TRUST 2023-R1**, whose address is **500 DELAWARE AVENUE, 11TH FLOOR, WILMINGTON, DE 19801**, (ASSIGNOR), does hereby grant, assign and transfer to **U.S. BANK TRUST NATIONAL ASSOCIATION, NOT IN ITS INDIVIDUAL CAPACITY BUT SOLELY AS OWNER TRUSTEE FOR RCF 2 ACQUISITION TRUST**, whose address is **C/O SELENE FINANCE LP, 3501 OLYMPUS BLVD., SUITE 500, DALLAS, TX 75019**, (ASSIGNEE), its successors, transferees and assigns forever, all beneficial interest under that certain mortgage, together with the certain note(s) described therein with all interest, all liens, and any rights due or to become due thereon.

Date of Mortgage: **5/27/2005**
Original Loan Amount: **$92,000.00**
Executed by (Borrower(s)): **JACKIE M HILL**
Original Lender: **AMERICAN GENERAL CONSUMER DISCOUNT COMPANY**
Filed of Record: In Book/Liber/Volume **11493**, Page **0453**
Document/Instrument No: **2005082014** in the Recording District of **Montgomery**, PA, Recorded on **6/15/2005.**
**MUNICIPALITY: BOROUGH OF NORRISTOWN**

Property more commonly described as: **314 E BASIN RD, NORRISTOWN, PA 19401**

[redacted]

IN WITNESS WHEREOF, the undersigned by its duly elected officers and pursuant to proper authority of its board of directors has duly executed, sealed, acknowledged and delivered this assignment.

Date: OCT 13 2026

**WILMINGTON SAVINGS FUND SOCIETY, FSB, AS INDENTURE TRUSTEE WITH RESPECT TO CIM TRUST 2023-R1, BY ROCKET MORTGAGE, LLC SUCCESSOR BY MERGER TO NATIONSTAR MORTGAGE LLC, ITS ATTORNEY-IN-FACT**

By: **TSEDALE ALEMU**
Title: **AUTHORIZED SIGNATORY**

Witness Name: Tuyet Vo

I hereby certify the precise address of the within named **U.S. BANK TRUST NATIONAL ASSOCIATION, NOT IN ITS INDIVIDUAL CAPACITY BUT SOLELY AS OWNER TRUSTEE FOR RCF 2 ACQUISITION TRUST** *(Assignee) is* **C/O SELENE FINANCE LP, 3501 OLYMPUS BLVD., SUITE 500, DALLAS, TX 75019.**

Tsedale Alemu

| A NOTARY PUBLIC OR OTHER OFFICER COMPLETING THIS CERTIFICATE VERIFIES ONLY THE IDENTITY OF THE INDIVIDUAL WHO SIGNED THE DOCUMENT TO WHICH THIS CERTIFICATE IS ATTACHED, AND NOT THE TRUTHFULNESS, ACCURACY, OR VALIDITY OF THAT DOCUMENT |
|---|

State of **TEXAS**
County of **DALLAS**

On OCT 13 2026, before me, **SYLVIA RAMIREZ**, a Notary Public, personally appeared **TSEDALE ALEMU, AUTHORIZED SIGNATORY** of/for **ROCKET MORTGAGE, LLC SUCCESSOR BY MERGER TO NATIONSTAR MORTGAGE LLC, AS ATTORNEY-IN-FACT FOR WILMINGTON SAVINGS FUND SOCIETY, FSB, AS INDENTURE TRUSTEE WITH RESPECT TO CIM TRUST 2023-R1**, personally known to me, or who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of **TEXAS** that the foregoing paragraph is true and correct. I further certify TSEDALE ALEMU, signed, sealed, attested and delivered this document as a voluntary act in my presence.

Witness my hand and official seal.

(Notary Name): **SYLVIA RAMIREZ**
My commission expires: **03/13/2027**

SYLVIA RAMIREZ
Notary Public, State of Texas
Comm. Expires 03-13-2027
Notary ID 131921660

[redacted]

# EXHIBIT "E"

**L.B.F. 3015.1**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | | |
|---|---|---|---|
| In re: | Hill, Jackie M. | Chapter | 13 |
| | | Case No. | [redacted] |
| | Debtor(s) | | |

# Chapter 13 Plan

❑ Original
☑ Second Amended

Date: 01/27/2026

**THE DEBTOR HAS FILED FOR RELIEF UNDER**
**CHAPTER 13 OF THE BANKRUPTCY CODE**

**YOUR RIGHTS WILL BE AFFECTED**

You should have received from the court a separate Notice of the Hearing on Confirmation of Plan, which contains the date of the confirmation hearing on the Plan proposed by the Debtor. This document is the actual Plan proposed by the Debtor to adjust debts. You should read these papers carefully and discuss them with your attorney. **ANYONE WHO WISHES TO OPPOSE ANY PROVISION OF THIS PLAN MUST FILE A WRITTEN OBJECTION** in accordance with Bankruptcy Rule 3015 and Local Rule 3015-4. **This Plan may be confirmed and become binding, unless a written objection is filed.**

**IN ORDER TO RECEIVE A DISTRIBUTION UNDER THE PLAN, YOU MUST FILE A PROOF OF CLAIM BY THE DEADLINE STATED IN THE NOTICE OF MEETING OF CREDITORS.**

## Part 1: Bankruptcy Rule 3015.1(c) Disclosures

❑ Plan contains non-standard or additional provisions – see Part 9

❑ Plan limits the amount of secured claim(s) based on value of collateral and/or changed interest rate – see Part 4

❑ Plan avoids a security interest or lien – see Part 4 and/or Part 9

## Part 2: Plan Payment, Length and Distribution – *PARTS 2(c) & 2(e) MUST BE COMPLETED IN EVERY CASE*

**§ 2(a) Plan payments (For Initial and Amended Plans):**

**Total Length of Plan:** 60 **months.**

**Total Base Amount** to be paid to the Chapter 13 Trustee ("Trustee") $72,075.00

Debtor shall have already paid the Trustee $3,600.00 through month number 5 and then shall pay the Trustee $1,245.00 per month for the remaining 55 months.

☐ Other changes in the scheduled plan payment are set forth in § 2(d)

**§ 2(b) Debtor shall make plan payments to the Trustee from the following sources in addition to future wages (Describe source, amount and date when funds are available, if known):**

**§ 2(c) Alternative treatment of secured claims:**

☑ **None.** If "None" is checked, the rest of § 2(c) need not be completed.

**§ 2(d) Other information that may be important relating to the payment and length of Plan:**

**§ 2(e) Estimated Distribution:**

| | | | | |
|---|---|---|---|---|
| A. | Total Administrative Fees (Part 3) | | | |
| | 1. | Postpetition attorney's fees and costs | $ | 3,835.00 |
| | 2. | Postconfirmation Supplemental attorney's fees and costs | $ | 0.00 |
| | | Subtotal | $ | 3,835.00 |
| B. | Other Priority Claims (Part 3) | | $ | 15,078.60 |
| C. | Total distribution to cure defaults (§ 4(b)) | | $ | 12,954.21 |
| D. | Total distribution on secured claims (§§ 4(c) &(d)) | | $ | 0.00 |
| E. | Total distribution on general unsecured claims(Part 5) | | $ | 32,968.43 |
| | | Subtotal | $ | 64,836.24 |
| F. | Estimated Trustee's Commission | | $ | 7,204.03 |
| G. | Base Amount | | $ | 72,075.00 |

**§2 (f) Allowance of Compensation Pursuant to L.B.R. 2016-3(a)(2)**

☑ **By checking this box, Debtor's counsel certifies that the information contained in Counsel's Disclosure of Compensation [Form B2030] is accurate, qualifies counsel to receive compensation pursuant to L.B.R. 2016-3(a)(2), and requests this Court approve counsel's compensation in the total amount of $ 5,335.00 , with the Trustee distributing to counsel the amount stated in §2(e)A.1. of the Plan. Confirmation of the plan shall constitute allowance of the requested compensation.**

## Part 3: Priority Claims

**§ 3(a) Except as provided in § 3(b) below, all allowed priority claims will be paid in full unless the creditor agrees otherwise.**

| Creditor | Proof of Claim Number | Type of Priority | Amount to be Paid by Trustee |
|---|---|---|---|
| Cibik Law, P.C. | | Attorney Fees | $3,835.00 |
| Internal Revenue Service | 4 | Taxes or Penalties Owed to Governmental Units | $13,011.53 |
| Pennsylvania Department of Revenue | 1 | Taxes or Penalties Owed to Governmental Units | $2,067.07 |

**§ 3(b) Domestic Support obligations assigned or owed to a governmental unit and paid less than full amount.**

☑ **None.** If "None" is checked, the rest of § 3(b) need not be completed.

## Part 4: Secured Claims

**§ 4(a) Secured Claims Receiving No Distribution from the Trustee:**

☑ **None.** If "None" is checked, the rest of § 4(a) need not be completed.

**§ 4(b) Curing default and maintaining payments**

☐ **None.** If "None" is checked, the rest of § 4(b) need not be completed.

The Trustee shall distribute an amount sufficient to pay allowed claims for prepetition arrearages; and, Debtor shall pay directly to creditor monthly obligations falling due after the bankruptcy filing in accordance with the parties' contract.

| Creditor | Proof of Claim Number | Description of Secured Property and Address, if real property | Amount to be Paid by Trustee |
|---|---|---|---|
| Mrc/united Wholesale M (Arrearage) | 3 | 314 E Basin St Norristown, PA 19401-4059 | $12,954.21 |

**§ 4(c) Allowed secured claims to be paid in full: based on proof of claim or preconfirmation determination of the amount, extent or validity of the claim**

☑ **None.** If "None" is checked, the rest of § 4(c) need not be completed.

**§ 4(d) Allowed secured claims to be paid in full that are excluded from 11 U.S.C. § 506**

☑ **None.** If "None" is checked, the rest of § 4(d) need not be completed.

**§ 4(e) Surrender**

☑ **None.** If "None" is checked, the rest of § 4(e) need not be completed.

**§ 4(f) Loan Modification**

☑ **None.** If "None" is checked, the rest of § 4(f) need not be completed.

(1) Debtor shall pursue a loan modification directly with _______________ or its successor in interest or its current servicer ("Mortgage Lender"), in an effort to bring the loan current and resolve the secured arrearage claim.

(2) During the modification application process, Debtor shall make adequate protection payments directly to Mortgage Lender in the amount of _______________ per month, which represents _______________ (***describe basis of adequate protection payment***). Debtor shall remit the adequate protection payments directly to the Mortgage Lender.

(3) If the modification is not approved by ______________ (date), Debtor shall either (A) file an amended Plan to otherwise provide for the allowed claim of the Mortgage Lender; or (B) Mortgage Lender may seek relief from the automatic stay with regard to the collateral and Debtor will not oppose it.

## Part 5: General Unsecured Claims

**§ 5(a) Separately classified allowed unsecured non-priority claims**

☑ **None.** If "None" is checked, the rest of § 5(a) need not be completed.

**§ 5(b) Timely filed unsecured non-priority claims**

***(1)*** Liquidation Test ***(check one box)***

☐ All Debtor(s) property is claimed as exempt.

☑ Debtor(s) has non-exempt property valued at $ **48,380.41** for purposes of § 1325(a)(4) and plan provides for distribution of $ **48,047.03** to allowed priority and unsecured general creditors.

**(2)** Funding: § 5(b) claims to be paid as follows ***(check one box):***

☐ Pro rata

☑ 100%

☐ Other (Describe) ______________________________

## Part 6: Executory Contracts & Unexpired Leases

☑ **None.** If "None" is checked, the rest of § 6 need not be completed.

## Part 7: Other Provisions

**§ 7(a) General principles applicable to the Plan**

(1) Vesting of Property of the Estate ***(check one box)***

☑ Upon confirmation

☐ Upon discharge

(2) Subject to Bankruptcy Rule 3012 and 11 U.S.C. §1322(a)(4), the amount of a creditor's claim listed in its proof of claim controls over any contrary amounts listed in Parts 3, 4 or 5 of the Plan. Debtor shall amend the plan or file an objection should a filed unsecured claim render the Plan unfeasible.

(3) Post-petition contractual payments under § 1322(b)(5) and adequate protection payments under § 1326(a)(1)(B),(C) shall be disbursed to the creditors by the debtor directly. All other disbursements to creditors shall be made by the Trustee.

(4) If Debtor is successful in obtaining a recovery in a personal injury or other litigation in which Debtor is the plaintiff, before the completion of plan payments, any such recovery in excess of any applicable exemption will be paid to the Trustee as a special Plan payment to the extent necessary to pay priority and general unsecured creditors, or as agreed by the Debtor and the Trustee and approved by the court.

**§ 7(b) Affirmative duties on holders of claims secured by a security interest in debtor's principal residence**

(1) Apply the payments received from the Trustee on the pre-petition arrearage, if any, only to such arrearage.

(2) Apply the post-petition monthly mortgage payments made by the Debtor to the post-petition mortgage obligations as provided for by the terms of the underlying mortgage note.

(3) Treat the pre-petition arrearage as contractually current upon confirmation for the Plan for the sole purpose of precluding the imposition of late payment charges or other default-related fees and services based on the pre-petition default or default(s). Late charges may be assessed on post-petition payments as provided by the terms of the mortgage and note.

(4) If a secured creditor with a security interest in the Debtor's property sent regular statements to the Debtor pre-petition, and the Debtor provides for payments of that claim directly to the creditor in the Plan, the holder of the claims shall resume sending customary monthly statements.

(5) If a secured creditor with a security interest in the Debtor's property provided the Debtor with coupon books for payments prior to the filing of the petition, upon request, the creditor shall forward post-petition coupon book(s) to the Debtor after this case has been filed.

(6) Debtor waives any violation of stay claim arising from the sending of statements and coupon books as set forth above.

**§ 7(c) Sale of Real Property**

☑ **None.** If "None" is checked, the rest of § 7(c) need not be completed.

## Part 8: Order of Distribution

**The order of distribution of Plan payments will be as follows:**

**Level 1:** Trustee Commissions*
**Level 2:** Domestic Support Obligations
**Level 3:** Adequate Protection Payments
**Level 4:** Debtor's attorney's fees
**Level 5:** Priority claims, pro rata
**Level 6:** Secured claims, pro rata
**Level 7:** Specially classified unsecured claims
**Level 8:** General unsecured claims
**Level 9:** Untimely filed general unsecured non-priority claims to which debtor has not objected

***Percentage fees payable to the standing trustee will be paid at the rate fixed by the United States Trustee not to exceed ten (10) percent. If the Trustee's compensation rate increases resulting in the Plan becoming underfunded, the debtor shall move to modify the Plan to pay the difference.***

## Part 9: Non Standard or Additional Plan Provisions

Under Bankruptcy Rule 3015.1(e), Plan provisions set forth below in Part 9 are effective only if the applicable box in Part 1 of this Plan is checked. Nonstandard or additional plan provisions placed elsewhere in the Plan are void.

☑ **None.** If "None" is checked, the rest of Part 9 need not be completed.

## Part 10: Signatures

By signing below, attorney for Debtor(s) or unrepresented Debtor(s) certifies that this Plan contains no nonstandard or additional provisions other than those in Part 9 of the Plan, and that the Debtor(s) are aware of, and consent to the terms of this Plan.

Date: **01/27/2026** **/s/ Michael A. Cibik**

Michael A. Cibik
Attorney for Debtor(s)

If Debtor(s) are unrepresented, they must sign below.

Date: ____________________ ________________________________

Jackie M. Hill
Debtor

Date: ____________________ ________________________________

Joint Debtor

# EXHIBIT "F"

| | |
|---|---|
| Loan Number | [redacted] |
| Borrower | Jackie M. Hill |
| Payments in POC (Arrears | Principal & interest due is $6428.30 Prepetition fees due is $1571.28; |
| Case Number | [redacted] |
| Filing Date | 7/30/2025 |
| 1st Post Due Date | 8/1/2025 |

POST-PETITION
PAYMENT CHANGES

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **EFFECTIVE** | 08/01/25 | 09/01/26 | | | | | |
| **AMOUNT** | 1121.21 | 1218.02 | | | | | |

| Date Received | Amount Received | Payment Amount Due | To/From Suspense | Suspense Balance | Due Date | Comments |
|---|---|---|---|---|---|---|
| | | | | 0.00 | | |
| 8/12/2025 | 1150.00 | 1121.21 | 28.79 | 28.79 | 8/1/2025 | |
| 9/23/2025 | 1130.00 | 1121.21 | 8.79 | 37.58 | 9/1/2025 | |
| 10/15/2025 | 1130.00 | 1121.21 | 8.79 | 46.37 | 10/1/2025 | |
| 11/17/2025 | 1130.00 | 1121.21 | 8.79 | 55.16 | 11/1/2025 | |
| 12/22/2025 | 1130.00 | 1121.21 | 8.79 | 63.95 | 12/1/2025 | |
| 1/26/2026 | 1130.00 | 1121.21 | 8.79 | 72.74 | 1/1/2026 | |
| 4/1/2026 | 1150.00 | 1121.21 | 28.79 | 101.53 | 2/1/2026 | |
| 6/17/2026 | 1150.00 | 1121.21 | 28.79 | 130.32 | 3/1/2026 | |
| 7/2/2026 | 1150.00 | 1121.21 | 28.79 | 159.11 | 4/1/2026 | Next due 05/01/2026 |
| | | | 0.00 | 159.11 | | |
| | | | 0.00 | 159.11 | | |
| | | | 0.00 | 159.11 | | |
| | | | 0.00 | 159.11 | | |
| | | | 0.00 | 159.11 | | |
| | | | 0.00 | 159.11 | | |

| | | |
|---|---|---|
| **Arrears Due:** | 5/1/2026 | 1121.21 |
| | 6/1/2026 | 1121.21 |
| | 7/1/2026 | 1121.21 |
| | 8/1/2026 | 1121.21 |
| | 9/1/2026 | 1218.02 |
| | 10/1/2026 | 1218.02 |
| | 11/1/2026 | 1218.02 |
| Less suspense: | | (159.11) |
| **TOTAL:** | | **$7,979.79** |

## Payoff Calculation Totals (PAY4/PG1)

```
[redacted] AS-OF 11/12/26  PAYOFF CALCULATION TOTALS 11/11/26  01:15:44
NAME JM HILL     CONTACT NAME JACKIE M. HILL
-------------------------------------------------------------------------------
PRINCIPAL BALANCE          91,365.87        ------- INTEREST CHARGES ----------
INTEREST 11/12/26           8,248.07        INT FROM                  AMOUNT
PRO RATA MIP/PMI                 .00        07/01/25                8,183.39
ESCROW ADVANCE              6,134.74        11/11/26                   64.68
ESCROW BALANCE                   .00        11/12/26                     .00
SUSPENSE BALANCE              173.56-       11/12/26
HUD BALANCE                      .00
REPLACEMENT RESERVE              .00        PF13 FOR SEGMENT DETAIL
RESTRICTED ESCROW                .00
TOTAL-FEES                     58.75        PF8 FOR ADDITIONAL BALANCES
ACCUM LATE CHARGES               .00
ACCUM NSF CHARGES                .00
OTHER FEES DUE                   .00
PENALTY INTEREST                 .00
FLAT/OTHER PENALTY FEE           .00        TOTAL INTEREST          8,248.07
CR LIFE/ORIG FEE RBATE           .00        TOTAL TO PAYOFF       111,231.78
RECOVERABLE BALANCE         5,597.91  NUMBER OF COPIES: 1    PRESS PF1 TO PRINT
                                            TOTAL PAGE 2                 .00

-------------------------------------------------------------------------------
```

## Payoff Calculation Totals (PAY4/PG2)

```
[redacted] AS-OF 11/12/26  PAYOFF CALCULATION TOTALS 11/11/26  01:16:31
NAME JM HILL     CONTACT NAME JACKIE M. HILL
-----------------------------------------------------------------------------
RREM DEFERRED FEE                .00      ******** INFORMATION ONLY *********
COST RECAPTURE DUE               .00      AMOUNTS INCLUDED IN PAYOFF ELEMENTS
---- PMT DEFERRED BALANCES DUE ----       RREM DEFERRED INT               .00
PMT DEFERRED PRIN                .00      PRINCIPAL DEFERMENT             .00
PMT DEFERRED INT                 .00      ***********************************
PMT DEFERRED ESC ADV             .00
PMT DEFERRED CORP AD             .00
PMT DEFERRED FEE                 .00


                                          TOTAL PAGE 1         111,231.78
                                                PAGE 2                .00
                                          TOTAL TO PAYOFF      111,231.78

-----------------------------------------------------------------------------
```

# EXHIBIT "G"

**Fill in this information to identify your case and this filing:**

| | | | |
|---|---|---|---|
| Debtor 1 | Jackie | M. | Hill |
| | First Name | Middle Name | Last Name |
| Debtor 2 (Spouse, if filing) | | | |
| | First Name | Middle Name | Last Name |

United States Bankruptcy Court for the: Eastern District of Pennsylvania

Case number [redacted]

❑ Check if this is an amended filing

Official Form 106A/B

# Schedule A/B: Property

12/15

**In each category, separately list and describe items. List an asset only once. If an asset fits in more than one category, list the asset in the category where you think it fits best. Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write your name and case number (if known). Answer every question.**

## Part 1: Describe Each Residence, Building, Land, or Other Real Estate You Own or Have an Interest In

1. **Do you own or have any legal or equitable interest in any residence, building, land, or similar property?**

❑ No. Go to Part 2.
☑ Yes. Where is the property?

1.1 314 E Basin St
Street address, if available, or other description

Norristown, PA 19401-4059
City State ZIP Code

Montgomery
County

**What is the property?** Check all that apply.
☑ Single-family home
❑ Duplex or multi-unit building
❑ Condominium or cooperative
❑ Manufactured or mobile home
❑ Land
❑ Investment property
❑ Timeshare
❑ Other

**Who has an interest in the property?** Check one.
☑ Debtor 1 only
❑ Debtor 2 only
❑ Debtor 1 and Debtor 2 only
❑ At least one of the debtors and another

Do not deduct secured claims or exemptions. Put the amount of any secured claims on *Schedule D: Creditors Who Have Claims Secured by Property.*

| **Current value of the entire property?** | **Current value of the portion you own?** |
|---|---|
| $179,840.00 | $179,840.00 |

**Describe the nature of your ownership interest (such as fee simple, tenancy by the entireties, or a life estate), if known.**
Fee Simple

❑ **Check if this is community property** (see instructions)

**Other information you wish to add about this item, such as local property identification number:**

**Source of Value:** Zillow ($224,800 less 20% closing costs)

2. **Add the dollar value of the portion you own for all of your entries from Part 1, including any entries for pages you have attached for Part 1. Write that number here** .......... ➔ $179,840.00

## Part 2: Describe Your Vehicles

**Do you own, lease, or have legal or equitable interest in any vehicles, whether they are registered or not?** Include any vehicles you own that someone else drives. If you lease a vehicle, also report it on *Schedule G: Executory Contracts and Unexpired Leases.*

3. **Cars, vans, trucks, tractors, sport utility vehicles, motorcycles**

❑ No
☑ Yes